**SCRIPSAMERICA, INC., Plaintiff,**

v.

**IRONRIDGE GLOBAL LLC d/b/a Ironridge Global IV, Ltd., John Kirkland, Brendan O'Neil, and Does 1–5, Defendants.**

Case No. CV 14–03962 MMM (AGRx).

United States District Court, C.D. California.

Signed Nov. 3, 2014.

Carlos E. Needham, Carlos Needham Law Offices, Valencia, CA, for Plaintiff.

Shannon Edward Mader, Gibson Dunn and Crutcher LLP, Los Angeles, CA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND GRANTING DEFENDANTS' MOTION TO STAY

MARGARET M. MORROW, District Judge.

On May 22, 2014, ScripsAmerica, Inc. ("Scrips") filed this action against Ironridge Global LLC d/b/a Ironridge Global IV, Ltd., John Kirkland, and Brendan O'Neil (collectively "Ironridge"), as well as certain fictitious defendants.[1] The complaint alleges claims for securities fraud, breach of contract, tortious bad faith, and declaratory relief. The claims arise from an allegedly fraudulent scheme to manipulate Scrips' stock price in order to obtain additional shares of the stock under an

---

1. Complaint, Docket No. 1 (May 22, 2014).

agreement between the parties pursuant to which Ironridge would pay off certain of Scrips' accounts payable in exchange for issuance of stock set by an agreed upon formula.[2]

On June 25, 2014, defendants filed a motion to dismiss, or alternatively to stay.[3] Scrips opposes the motion.[4]

## I. FACTUAL BACKGROUND

This action arises out of an allegedly fraudulent scheme devised by Ironridge. Scrips is a pharmaceuticals distributor whose stock is publicly traded on the over-the-counter ("OTC") market. Ironridge's purported scheme involved the issuance of Scrips' common stock to Ironridge in exchange for an undertaking by Ironridge to pay Scrips' outstanding accounts payable.[5] Scrips alleges that the transaction was first proposed during a telephone call it received from John Kirkland and Brendan O'Neil—directors of Ironridge—on August 28, 2013.[6] It contends that Kirkland and O'Neil told Scrips' chief executive officer, Robert Schneiderman, that Ironridge could pay Scrips' accounts payable, which totaled approximately $700,000, in exchange for an amount of Scrips stock to be determined by contractual formula.[7] Kirkland and O'Neil explained that to effect the exchange, Scrips did not need to register the shares before transferring them to Ironridge. The parties discussed the trans-action further on September 4 and October 2, 2013.[8]

During the calls, Ironridge requested that the contract memorializing the transaction include a provision for an adjustment to protect it in the event of a decline in Scrips' stock price.[9] Scrips allegedly agreed to the inclusion of such a provision, pursuant to which Ironridge was to receive more stock than the originally agreed amount if Scrips' stock price declined following consummation of the transaction.[10] The adjustment mechanism was outlined, together with certain other terms, in a term sheet Ironridge prepared and gave to Scrips.[11] Scrips contends that Ironridge, Kirkland, and O'Neil did not disclose their intention to manipulate the market for Scrips shares in order to reduce the share price and increase the number of shares Ironridge was entitled to receive under the agreement.[12]

On October 4, 2013, Schneiderman, Kirkland, and O'Neil purportedly discussed the potential effect Ironridge's sale of the stock it received might have on Scrips' share price. Unlike other entities that had funded Scrips in exchange for stock, Ironridge allegedly represented that it would not act to manipulate or otherwise affect Scrips' stock price.[13] Specifically, Ironridge purportedly said that its sales of Scrips shares would "never be more than ten percent of the volume of sales on any

2. *Id.*, ¶ 11.

3. Motion to Dismiss or Stay Plaintiff's Complaint ("Motion"), Docket No. 9 (Jun. 25, 2014).

4. Plaintiff's Opposition to Motion to Dismiss or Stay ("Opposition"), Docket No. 13 (Sept. 26, 2014).

5. Complaint, ¶ 4, 11.

6. *Id.*

7. *Id.*

8. *Id.*

9. *Id.*, ¶ 12

10. *Id.*

11. *Id.*, ¶ 13. See also *id.*, Exh. 1 (Term Sheet).

12. *Id.*, ¶ 12.

13. *Id.*, ¶ 15.

given day." [14] Scrips contends that Ironridge's representations were knowingly and wilfully false.[15]

Because the shares were unregistered, Ironridge and Scrips had to obtain court approval under California and federal securities laws before a transfer of the stock could take place.[16] Thus, on October 11, 2013, Ironridge filed a breach of contract complaint in Los Angeles Superior Court that sought to collect the accounts payable debts; it sued as the successor in interest to Scrips' creditors under receivables purchase agreements into which it had entered with the creditors.[17] Ironridge and Scrips then submitted a stipulation to the court that was the means by which the exchange transaction was to be effected. The stipulation provided that Scrips would transfer 8,690,000 shares of stock to Ironridge in satisfaction of $686,962.08 in debt owned by Ironridge.[18] The shares were to be "unrestricted and freely tradeable exempted shares" of Scrips common stock.[19]

The stipulation stated the shares had to be capable of being "immediately resold ... without restriction," [20] and noted that Ironridge could "sell any of its shares of [Scrips] common stock issued pursuant to the [stipulation] at any time." [21] The stipulation warned that issuance of the shares could "have a dilutive effect [on Scrips' stock], which [might] be substantial." [22]

The stipulation also memorialized the adjustment mechanism the parties had previously discussed. First, Scrips would immediately issue and deliver to Ironridge 8,690,000 shares of its common stock; the issuance, however, was subject to certain "adjustments, issuances, returns, and ownership limitations." [23] Future adjustments were to be made based on trading activity in Scrips stock during the "calculation period." [24] The "final amount" of shares to which Ironridge was entitled was to be calculated by taking (a) the sum of the claim amount [i.e., $686,962.08], 10 % of third party agent fees, and Ironridge's rea-

14. *Id.*

15. *Id.*

16. *California Corporation Code § 25017(f)(3)* excludes from the definition of offer or sale—and hence from the ambit of California's securities registration laws—"any act incident to a transaction or reorganization approved by a state or federal court in which securities are issued and exchanged for one or more outstanding securities, claims, or property interests, or partly in that exchange and partly for cash." See CAL. CORP. CODE § 25017(f)(3). Section 3(a)(10) of the Securities Act of 1933 exempts from registration "any security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests ... where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court, or by any official or agency of the United States, or by any State or Territorial banking or insurance commission or other governmental authority expressly au-

thorized by law to grant such approval." See 15 U.S.C § 77c(10).

17. Declaration of Shannon E. Mader in Support of Defendants' Motion to Dismiss or Stay Plaintiffs' Complaint ("Mader Decl."), Docket No. 9–1 (June 25, 2014), Exh. A (Ironridge's State Court Complaint for Breach of Contract Against Scrips) ("State Court Complaint"), ¶¶ 1–6.

18. See Complaint, ¶ 16. See also *id.*, Exh. 2 (Stipulation for Settlement of Claims) ("Stipulation"), ¶¶ 1–3.

19. See Stipulation, ¶¶ 1–3.

20. *Id.*, ¶ 6.

21. *Id.*

22. *Id.*, ¶ 11.

23. *Id.*, ¶ 6.

24. *Id.*, ¶ 7.

sonable attorneys' fees and expenses, and dividing it by (b) 80 % of the following: the closing price of Scrips common stock on the trading day immediately preceding the date the state court entered an order on the stipulation; the resulting number was not to exceed the arithmetic average of the individual volume weighted average price of any five trading days during the calculation period, less $.01 per share (based on data reported by Bloomberg LP).[25]

The stipulation also provided that if at any point during the calculation period the shares issued to Ironridge dropped below "any reasonably possible [f]inal [a]mount" or if Scrips shares closed below 80 % of the closing price on the trading day prior to entry of an order on the stipulation, Ironridge was entitled to request the issuance of additional shares.[26] At the conclusion of the calculation period, if the total value of the initial issuance and subsequent issuances was less than the final amount, Scrips was required to issue further shares so that the total number of shares issued equaled the final amount; conversely, if the number of shares issued to Ironridge exceeded the final amount, Ironridge was required to return the excess shares to Scrips.[27] The stipulation stated, however, that Scrips was not required to issue at any one time a number of shares that, aggregated with all other shares beneficially owned or controlled by Ironridge or its affiliates, exceeded 9.99 % of the total number of shares of common stock outstanding.[28] Despite the fact that Kirkland, O'Neil, and Schneiderman allegedly discussed the issue, there is no provision in the stipulation requiring that Ironridge's sales of Scrips shares not exceed 10% of the daily trading volume on any given day.

On November 8, 2013, the parties filed a joint *ex parte* application in state court for an order approving the stipulation; they argued that *ex parte* relief was necessary because the stipulation addressed the issuance of "shares of [Scrips] stock with a substantially fluctuating market price." [29] The application recited that over the course of the previous year, the price of Scrips common stock had fluctuated between $1.05 and $.08, and that it would be difficult to reach any negotiated resolution that did not require *ex parte* relief, as the agreement could collapse if Scrips' stock price fluctuated too much.[30] As support for their request that the court approve the stipulation, both parties filed declarations stating that they believed the terms of agreement were fair.[31] The stipulation

25. *Id.*

26. *Id.,* ¶ 8.

27. *Id.,* ¶ 10.

28. *Id.,* ¶ 9.

29. Mader Decl., Exh. C (Joint Ex Parte Application for Order Approving Stipulation for Settlement of Claims) at 2–3.

30. *Id.*

31. Brandon O'Neil, Ironridge's Managing Director, stated that the terms of the agreement were fair to Ironridge. (See Mader Decl., Exh. D (Declaration of Brandon O'Neil in Support of Joint *Ex Parte* Application for Or-

der Approving Settlement of Claims), ¶ 5 ("Based on my analysis, the terms and conditions of the issuance and exchange are fair to Ironridge. The number of shares to be issued pursuant to the settlement should more than fairly compensate Ironridge for the claims"). Robert Schneiderman, Scrips' chief executive officer, similarly reported that the terms were fair to Ironridge and to Scrips. (See *id.,* Exh. E (Declaration of Robert Schneiderman in Support of Joint *Ex Parte* Application for Order Approving Settlement of Claims)), ¶ 8 ("It is my belief that the terms and conditions of the settlement of the claims, as set forth in the Stipulation, are fair, reasonable and adequate to Ironridge. Further, the board of directors of [Scrips] has considered the proposed settlement and has resolved that its terms and

recited that the agreement was fair to Ironridge and that Scrips' board had resolved that the terms were fair to and in the best interests of its shareholders.[32]

On November 8, 2013, Superior Court Judge Rolf M. Treu entered an order on the parties' stipulation.[33] Scrips alleges that thereafter, on several trading days, Ironridge sold an amount of Scrips stock that exceeded ten percent of all sales on that day.[34] Specifically, it contends that Ironridge's sales during the week of January 6, 2014 represented 28.4 % of total sales; sales during the week of January 21, 2014 represented 22.6%; and weekly sales throughout February 2014 ranged from 30–50%.[35] Scrips maintains that Ironridge made these sales with the intent and purpose of manipulating the market to reduce the price of Scrips' stock so that the number of shares to which it was entitled under the parties' agreement would increase. Scrips contends that the sales in fact reduced its stock price.[36] It asserts that during the period of alleged manipulation, Ironridge refused to provide any information concerning its trading activity, claiming it was confidential.[37]

Based on the decline in Scrips' share price, Ironridge filed an *ex parte* application for an order compelling the issuance of additional shares pursuant to the May 6, 2014 stipulation.[38] Scrips opposed the application.[39] It argued that the court should deny it because Ironridge had engaged in "wrongful conduct" in "bad faith" and had "unclean hands." [40] Specifically, it asserted that Ironridge had fraudulently manipulated the market for Scrips stock, i.e., engaged in "open market manipulation," by "short selling" Scrips' shares during the calculation period in an effort to drive the share price down artificially and require Scrips to issue more shares to Ironridge pursuant to the terms of the parties' agreement.[41] Scrips also contended that Ironridge's conduct was a breach of the parties' agreement, as well as a breach of the covenant of good faith and fair dealing implied therein.[42] Finally, it asserted that additional issuance of shares "could be in violation of [federal] securities

conditions are fair to, and in the best interests of, SCRC and its stockholders").)

**32.** Stipulation, ¶ 4 ("Plaintiff has agreed to the proposed terms and conditions, and believes that they are sufficiently fair such that [Ironridge] is willing to enter into this stipulation. [Scrips'] board of directors has considered the proposed transaction and has resolved that its terms and conditions are fair to, and in the best interest of, [Scrips] and its stock holders. Accordingly, both parties request Court approval of the settlement provided for herein as fair, just and reasonable").

**33.** *Id.,* Exh. F (Order for Approval of Stipulation for Settlement of Claims).

**34.** *Id.,* ¶ 19.

**35.** *Id.*

**36.** *Id.,* ¶ 20.

**37.** *Id.,* ¶ 22.

**38.** Neither party has asked the court to take judicial notice of Ironridge's *ex parte* application for an order compelling the issuance of shares, nor is the document attached to the complaint. Nonetheless, it is referenced in (and logically antecedent to) Scrips' opposition to the *ex parte* application, a document that the court can judicially notice. (See Mader Decl., Exh. G (Defendant's Opposition to Plaintiff's *Ex Parte* Motion for an Order Compelling Issuance of Shares) ("Order to Compel Opp.").)

**39.** See *id.*

**40.** *Id.* at 1.

**41.** *Id.* at 3.

**42.** *Id.* at 4–5.

laws." [43]

On May 6, 2014, Judge Treu implicitly rejected each of Scrips' arguments. He entered an order enforcing the order that had approved the stipulation ("enforcement order"), and directing that Scrips issue an additional 1,646,008 shares of common stock to Ironridge pursuant to the adjustment mechanism set forth in the stipulation.[44] Scrips appealed the order on May 14, 2014.[45] That appeal is presently pending before the California Court of Appeal, with Scrips' opening brief due October 15, 2014.[46]

On May 22, 2014, eight days after appealing the enforcement order, Scrips filed this action, alleging claims for breach of contract, tortious bad faith, violation of Rule 10b–5, and declaratory relief. Scrips seeks a declaration that it need not issue the additional 1,646,008 shares that the Superior Court has ordered it to issue. Scrips maintains that Ironridge intentionally engaged in post-stipulation trading activity to manipulate the market and reduce the price of Scrips' stock in order to increase the number of shares it was to receive pursuant to the stipulation's calculation formula.[47] Scrips asserts that Ironridge manipulated its stock to send false information regarding the supply of and demand for Scrips' stock to the market, inducing others to sell Scrips stock and creating further market distortion.[48] Scrips contends that absent illegal manipulation by Ironridge, its stock would be trading at $0.15 per share instead of the current price of approximately $0.10. It asserts that Ironridge's manipulative actions have caused it to issue 10.3 million shares, instead of the 8.7 million initially required by the agreement, and that Ironridge is seeking issuance of a further 1.6 million shares through the California courts.[49] As a result, Scrips contends, it has been injured by issuing stock worth more than $1.4 million to Ironridge, in satisfaction of a less than $770,000 debt.[50]

## II. DISCUSSION

### A. Ironridge's Request for Judicial Notice

■■■■ Ironridge asks that the court take judicial notice of various documents related to the state court action.[51] Because Rule 12(b)(6) review is confined to the complaint, the court typically does not consider material outside the pleadings (e.g., facts presented in briefs, affidavits, or discovery materials) in deciding such a motion. *In re American Continental*

43. *Id.* at 4.

44. Mader Decl., Exh. H (Order Enforcing Prior Order for Approval of Stipulation for Settlement of Claims) ("Enforcement Order") at 1–2.

45. *Id.*, Exh. I (Notice of Appeal).

46. See *Ironridge Global IV, Ltd. v. ScripsAmerica*, Court of Appeal Case No. B256198, Order Granting Extension of Time to File Opening Brief, Docket No. 10 (Sept. 3, 2014).

47. *Id.*, ¶ 20.

48. *Id.*, ¶ 21. It is unclear from the complaint and judicially noticeable documents why

Scrips asserts, on the one hand, that it has *already* issued 10.3 million shares to Ironridge (i.e., the approximately 8.7 million shares initially issued plus the additional 1.6 million that are the subject of the enforcement order), and on the other, that Ironridge seeks "a further 1.6 million shares through the California courts." The complaint doe not allege that Scrips issued any stock to Ironridge beyond the initial 8.69 million shares.

49. *Id.*, ¶ 25.

50. *Id.*, ¶ 28.

51. Request for Judicial Notice ("RJN"), Docket No. 9–11 (Jun. 25, 2014) at 2–3.

*Corp./Lincoln Sav. & Loan Securities Litig.,* 102 F.3d 1524, 1537 (9th Cir.1996). It may, however, properly consider exhibits attached to the complaint and documents whose contents are alleged in the complaint but not attached, if their authenticity is not questioned. *Lee v. City of Los Angeles,* 250 F.3d 668, 688 (9th Cir.2001).

▮ In addition, the court can consider matters that are proper subjects of judicial notice under Rule 201 of the Federal Rules of Evidence. *Id.* at 688–89; *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994), overruled on other grounds by *Galbraith v. County of Santa Clara,* 307 F.3d 1119 (9th Cir.2002); *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.,* 896 F.2d 1542, 1555 n. 19 (9th Cir.1990); see also *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").[52] The court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Steckman v. Hart Brewing Inc.,* 143 F.3d 1293, 1295 (9th Cir.1998).

▮ Ironridge asks that the court take judicial notice of nine documents filed in the state court action.[53] These documents bear directly on whether the court can properly exercise jurisdiction over this case. It is well established that federal courts may take judicial notice of related state court orders and proceedings. See *Dawson v. Mahoney,* 451 F.3d 550, 551 (9th Cir.2006) (taking judicial notice of state court orders and proceedings); see also *United States v. Black,* 482 F.3d 1035, 1041 (9th Cir.2007) (stating that an appellate court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue"); *Farahani v. Floria,* No. 12–CV–04637–LHK, 2013 WL 1703384, *1 n. 1 (N.D.Cal. Apr. 19, 2013) ("The remaining documents submitted for judicial notice are all documents filed in previous and concurrent lawsuits, which are similarly suitable for judicial notice under Fed. R.Evid. 201(b)").

The parties' state court stipulation, moreover, which is Exhibit B to Ironridge's request for judicial notice, is attached to the complaint and therefore need not be judicially noticed to be considered in deciding the motion. See *Lee,* 250 F.3d at 688 ("a court may consider 'material which is properly submitted as part of the complaint' on a motion to dismiss without converting the motion to dismiss into a motion for summary judgment," quoting *Branch,* 14 F.3d at 453). Finally, as Ironridge notes, the state court order approving the parties' stipulation, which is Exhibit F to Ironridge's request for judicial notice, is referenced in the complaint, and can be considered under the incorporation by reference doctrine. See *United States v. Ritchie,* 342 F.3d 903, 908 (9th Cir.2003) (acknowledging that a district court may assume that the contents of a document incorporated by reference "are true for purposes of a motion to dismiss"); *In re Downey Sec. Litig.,* No. CV 08–3261–JFW,

---

52. Taking judicial notice of matters of public record does not convert a motion to dismiss into a motion for summary judgment. *MGIC Indemnity Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986).

53. RJN at 2–3. See also Mader Decl., Exhs. A–I.

2009 WL 2767670, *6 n. 4 (C.D.Cal. Aug. 21, 2009) (same).

### B. Legal Standard Governing Motions to Dismiss under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory," or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988). The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir.1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir.1995).

The court need not, however, accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Thus, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' ... A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); see also *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955

("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir.2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly* ).

### C. Whether the Court Should Dismiss Scrips' Claims Based on the *Rooker–Feldman* Doctrine

#### 1. Legal Standard Governing Application of the *Rooker–Feldman* Doctrine

 Under the *Rooker–Feldman* doctrine, which takes its name from the Supreme Court's decisions in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416, 44 S.Ct. 149, 68 L.Ed. 362 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 476, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), a federal district court does not have subject matter jurisdiction to hear a direct appeal from a final judgment of a state court. See *Noel v. Hall*, 341 F.3d 1148, 1155 (9th Cir.2003). A losing party in state court is thus barred from seeking what in substance would be appellate review of a state judgment in federal district court, even if the party contends the state judgment violated his or her federal rights. *Johnson v. DeGrandy*, 512 U.S. 997, 1005–06, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994); *Allah v. Superior Court*, 871 F.2d 887, 891 (9th Cir.1989) (stating that *Rooker–Feldman* doctrine "applies even though the direct challenge is anchored to alleged deprivations of federally protected due process and equal protection rights"), superseded by statute

on other grounds as stated in *Schroeder v. McDonald,* 55 F.3d 454, 458 (9th Cir.1995); *Worldwide Church of God v. McNair,* 805 F.2d 888, 891 (9th Cir.1986) ("This doctrine applies even when the challenge to the state court decision involves federal constitutional issues").

The rationale behind the *Rooker–Feldman* doctrine is threefold. First, the only federal court with the power to hear appeals from state courts is the United States Supreme Court. *Bennett v. Yoshina,* 140 F.3d 1218, 1223 (9th Cir.1998). Second, state courts are as competent as federal courts to decide federal constitutional issues. *Worldwide Church of God,* 805 F.2d at 891. Third, "any other rule would result in a waste of judicial resources and unnecessary friction between state and federal courts." *Id.*

■■ "When there is parallel state and federal litigation, *Rooker–Feldman* is not triggered simply by the entry of judgment in state court. Th[e] [Supreme] Court has repeatedly held that 'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the [f]ederal court having jurisdiction.'" *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 292, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). "Proceedings end for *Rooker–Feldman* purposes when the state courts *finally resolve* the issue that the federal court plaintiff seeks to relitigate in a federal forum, even if other issues remain pending at the state level." *Mothershed v. Justices of Supreme Court,* 410 F.3d 602 (9th Cir.2005) (emphasis added). Thus, where a federal action is filed "while the state court action continue[s] in the appeals process in state court, the state proceedings ha[ve] not ended." *Nicholson v. Shafe,* 558 F.3d 1266, 1278 (11th Cir.2009); *Guttman v. Khalsa,* 446 F.3d 1027, 1032 (10th Cir.2006) ("In this case, Guttman filed his federal suit while his petition for certiorari to the New Mexico Supreme Court was pending. His state suit was not final. As such, the *Rooker–Feldman* doctrine does not bar his federal suit and the district court does have subject matter jurisdiction to hear the case"); *Federacion de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico,* 410 F.3d 17, 24 (1st Cir.2005) ("*Exxon Mobil* tells us when a state court judgment is sufficiently final for operation of the *Rooker–Feldman* doctrine: when 'the state proceedings [have] ended.' If federal litigation is initiated *before* state proceedings have ended, then—even if the federal plaintiff expects to lose in state court and hopes to win in federal court—the litigation is parallel, and the *Rooker–Feldman* doctrine does not deprive the court of jurisdiction").[54]

---

**54.** Earlier Ninth Circuit decisions held that federal proceedings were barred by state court judgments under *Rooker–Feldman* whether or not the state court judgment was on appeal. See *Dubinka v. Judges of Superior Court of State of California for County of Los Angeles,* 23 F.3d 218, 221 (9th Cir.1994) (holding that the *Rooker–Feldman* doctrine "applies even when the state court judgment is not made by the highest state court"); *Worldwide Church of God,* 805 F.2d at 893 n. 3 ("We agree ... that the *Feldman* doctrine should apply to state judgments even though state court appeals are not final"). In concluding that *Rooker–Feldman* did not bar parallel federal court proceedings prior to the time the state court judgment was final, *Exxon Mobil* abrogated these Ninth Circuit holdings. The Ninth Circuit implicitly recognized this in *Mothershed,* stating that the doctrine applies only "when the state courts *finally resolve* the issue that the federal court plaintiff seeks to relitigate in a federal forum," and citing the First Circuit's decision in *Federacion,* which recognized *Exxon's* implications See *Mothershed,* 410 F.3d at 604 n. 1; *Federacion,* 410 F.3d at 24 ("*Exxon Mobil* tells us when a state court judgment is sufficiently final for operation of the *Rooker–Feldman* doctrine: when 'the state proceedings [have] ended.' If federal litigation is initiated *before*

 The *Rooker–Feldman* doctrine precludes the exercise of jurisdiction not only over claims that are *de facto* appeals of a state court decision but also over suits that raise issues that are "inextricably intertwined" with an issue resolved by the state court. See *Feldman*, 460 U.S. at 483 n. 16, 103 S.Ct. 1303; *Noel*, 341 F.3d at 1158. As the Ninth Circuit has explained: "If claims raised in the federal court action are 'inextricably intertwined' with the state court's decision such that the adjudication of the federal claims would undercut the state ruling or require the district court to interpret the application of state laws or procedural rules, then the federal complaint must be dismissed for lack of subject matter jurisdiction." *Bianchi v. Rylaarsdam*, 334 F.3d 895, 898 (9th Cir.2003).

 In determining whether a plaintiff's federal claims are "inextricably intertwined" with a state court decision, a court cannot simply " 'compare the *issues* involved in the state-court proceeding to those raised in the federal-court plaintiff.' " *Id.* at 900 (quoting *Kenmen Engineering v. City of Union*, 314 F.3d 468, 476 (10th Cir.2002)). Rather, it must " 'pay close attention to the relief sought by the federal-court plaintiff.' " *Id.* As the Ninth Circuit explained in *Worldwide Church of God*,

"claims are inextricably intertwined if the district court must scrutinize not only the challenged rule itself, but the state court's application of the rule. If, in order to resolve the claim, the district court would have to go beyond mere review of the state rule as promulgated, to an examination of the rule as applied by the state court to the particular factual circumstances of the plaintiff's case, then the court lacks jurisdiction." *Worldwide Church of God*, 805 F.2d at 892 (quotations and internal alterations omitted).

### 2. Application of *Rooker–Feldman* to the Facts of This Case

 Ironridge argues that Scrips' complaint should be dismissed for lack of subject matter jurisdiction because it is a *de facto* appeal from a final state court judgment and is thus barred by the *Rooker–Feldman* doctrine.[55] Specifically, Ironridge contends that Scrips' complaint is a *de facto* appeal of the state court order approving the parties' stipulation because it seeks to invalidate the stipulation on the basis that it was procured by fraud.[56] It asserts that the state court judgment is final because the stipulation was unappealable by its terms,[57] and because Scrips

state proceedings have ended, then—even if the federal plaintiff expects to lose in state court and hopes to win in federal court—the litigation is parallel, and the *Rooker–Feldman* doctrine does not deprive the court of jurisdiction"). Because the Supreme Court's decision in *Exxon Mobil* is irreconcilable with *Dubinka* and *Worldwide Church of God* insofar as they hold that *Rooker–Feldman* bars federal proceedings even if the relevant state court judgment is on appeal, the *Mothershed* panel could recognize, albeit implicitly, the overruling of the earlier circuit decisions. See *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir.2003) (a three judge panel may recognize that a prior circuit decision has been effectively overruled by Supreme Court and "hence is no longer binding on district judges

and three judge panels of the [Ninth Circuit]"). Ironridge does not argue otherwise. It contends the order on the parties' stipulation is final. It does not argue that the enforcement order, which is on appeal, is final for *Rooker–Feldman* purposes.

**55.** Motion at 9.

**56.** *Id.* at 11.

**57.** Stipulation, ¶ 17 ("Each party hereto waives a statement of decision, all rights to appeal, and all defenses to the Order and its enforcement, including without limitations any based on jurisdiction, standing, or splitting causes of action").

failed to file a notice of appeal within 60 sixty days of the entry of an order on the stipulation, as required by California law. See CAL. RULES OF COURT 8.104 (time for appeal is sixty days after notice or 180 days after the entry of judgment).[58]

While the complaint contains allegations that Ironridge executed a scheme to defraud that induced Scrips to enter into the agreement and stipulation, these allegations appear to form the basis for its Rule 10b–5 claim, as opposed to its breach of contract and breach of the implied covenant/tortious bad faith claims. The Rule 10b–5 claim does not seek to invalidate the parties' agreement or the state court order approving the stipulation that embodied it. Rather, it seeks damages for securities fraud. This is an "independent" claim that is not barred by *Rooker–Feldman*. See *Exxon Mobil*, 544 U.S. at 293, 125 S.Ct. 1517 ("If a federal plaintiff 'present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party ..., then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion,'" quoting *GASH Assocs. v. Rosemont*, 995 F.2d 726, 728 (7th Cir.1993), and citing *Noel*, 341 F.3d at 1163–64); *Great*

*Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 173 (3d Cir.2010) (holding, in a case where plaintiff alleged that adverse judgments entered against it in state court were the result of a conspiracy between defendants and the Pennsylvania judiciary, that *Rooker–Feldman* did not bar the claim because "while Great Western's claim for damages may require review of state-court judgments and even a conclusion that they were erroneous, those judgments would not have to be rejected or overruled for Great Western to prevail").

Similarly, Scrips' breach of contract and breach of the implied covenants claims do not seek to invalidate the parties' agreement, or the stipulated order the state court entered approving the stipulation that embodied it. Rather, they seek damages based on Ironridge's purported breach of the express or implied terms of the agreement and stipulation.[59] Consequently, these claims likewise are not barred by *Rooker–Feldman*.

 Scrips' declaratory relief claim, however, is of a different character. That claim requests that the court declare that Scrips "has no obligation to meet [Ironridge's] demands [for additional stock] be-

---

**58.** The fact that the stipulation was denominated a "settlement" in state court does not change the result. "A settlement agreement may constitute a state-court judgment for purposes of the *Rooker–Feldman* doctrine." See *William Villa v. Heller*, 885 F.Supp.2d 1042, 1048 (S.D.Cal.2012) (citing *Sherrard v. Panazuelos*, No. CV 10–9196–VAP–AGR, 2011 WL 1131523, *2 (C.D.Cal. Feb. 24, 2011) ("Effectively, Plaintiff is requesting that this Court set aside the settlement she reached")); see also *Wittich v. Wittich*, 06CV1635(JFB)(WDW), 2006 WL 3437407, *3 (E.D.N.Y. Nov. 29, 2006) ("for purposes of *Rooker–Feldman*, because plaintiff now seeks to overturn the settlement, alleging that the Settlement Agreement violated his rights, the Court deems plaintiff a losing party in a state court action"); *Green v. City of New York*, 438

F.Supp.2d 111, 119 (E.D.N.Y.2006) ("[C]ourts have treated settlement agreements as final judgments for purposes of the *Rooker–Feldman* doctrine."). Thus, contrary to Scrips' argument (Opposition at 6), it can be deemed the loser in state court for *Rooker–Feldman* purposes.

**59.** See Complaint, ¶¶ 42, 44 (asserting that Ironridge breached the terms of the parties' agreement "as reflected in paragraph 14 of the Stipulation," and breached the covenant of good faith implied therein because its conduct was "at odds with the understanding, reflected in ... the Stipulation, that Ironridge would not engage in trading activity designed to depress stock price").

*cause Scrips is excused from performing under the terms of the Stipulation* due to Ironridge's illegal conduct, breach of the Stipulation, and tortious bad faith." [60] The claim asserts that Ironridge continues to demand the issuance of additional shares in addition to those that the state court directed be issued in its enforcement order, now on appeal,[61] and requests that the court declare that Scrips has no obligation to comply with the stipulated judgment to the extent it compels Scrips to accede to these demands. This is equivalent to a request that the court declare the state court order approving the stipulation, and making it an enforceable judgment, void. This is precisely the type of claim that is barred by *Rooker–Feldman.* In this regard, courts distinguish between federal court plaintiffs who seek damages for fraud that led to the entry of a state court judgment, and those that seek to invalidate the state court judgment itself because it was procured by fraud. Compare *Illinois Central Railroad Co. v. Guy,* 682 F.3d 381, 391 (5th Cir.2012) (*Rooker–Feldman* does not bar a claim that state court plaintiffs' lawyers obtained a settlement judgment through fraudulent misrepresentations); *Great Western Mining & Mineral Co.,* 615 F.3d at 173 (*Rooker–Feldman* does not bar a federal plaintiff's damages claims based on allegations that defendants conspired to engineer its loss in state court by exercising improper influence over state judges); *McCormick v. Braverman,* 451 F.3d 382,

392–93 (6th Cir.2006) (*Rooker–Feldman* did not deprive the district court of jurisdiction to hear federal plaintiff's claims against a state court receiver and homeowners' insurer alleging fraud in obtaining a receivership order from state court) with *Morris v. American Home Mortg. Servicing, Inc.,* 443 Fed.Appx. 22, 24 (5th Cir. 2011) (Unpub.Disp.) (holding that an otherwise independent unlawful debt collection practices claim related to a foreclosure judgment was barred because the only relief sought "was the setting aside of the state foreclosure judgment and staying of the execution of the writ of possession"); *Turner v. Cade,* 354 Fed.Appx. 108, 110–11 (5th Cir.2009) (Unpub.Disp.) (holding that *Rooker–Feldman* barred a claim that a state court divorce decree was procured through fraud when the federal plaintiff asked the decree be declared void); *Ford v. U.S. Dep't of Treasury Internal Revenue Serv.,* 50 Fed.Appx. 490, 491 (2d Cir. 2002) (Unpub.Disp.) (plaintiff's claim seeking invalidation of a state court foreclosure judgment on the ground that it was procured through fraud was barred by *Rooker–Feldman* ).[62]

■ Scrips disputes this, arguing that it does not seek to have the court review the state court stipulated judgment, but rather Ironridge's "post-settlement abuse of [that] judgment." [63] It contends that, to the extent its complaint challenges any ruling of the state court, it is the order

---

**60.** *Id.,* ¶ 46 (emphasis added).

**61.** *Id.*

**62.** The Ninth Circuit's decision in *Kougasian v. TMSL, Inc.,* 359 F.3d 1136 (9th Cir.2004) is not to the contrary. There, the court held that the claims of a plaintiff alleging extrinsic fraud in the procurement of a state court judgment were not barred by *Rooker–Feldman* even though plaintiff sought invalidation of the state court judgment because the wrong complained of was the an erroneous state

court judgment but extrinsic fraud on the part of the adverse party. The *Kougasian* court noted that "[e]xtrinsic fraud is conduct which prevents a party from presenting his claim in court." *Id.* at 1140. Here, Scrips was not prevented from presenting its claim in court. Rather, it joined in seeking to have the state court enter the order approving the stipulation.

**63.** Opposition at 7.

enforcing the stipulated judgment and requiring the issuance of additional shares. Scrips asserts that decision is not "final" for purposes of *Rooker–Feldman* because it is presently on appeal.[64] See *Mothershed*, 410 F.3d at 605 n. 1 ("Proceedings end for *Rooker–Feldman* purposes when the state courts finally resolve the issue that the federal court plaintiff seeks to relitigate in a federal forum, even if other issues remain pending at the state level"); see also *Nicholson*, 558 F.3d at 1278 ("because the Appellants filed the instant federal action while the state court action continued in the appeals process in state court, the state proceedings had not ended"); *Guttman*, 446 F.3d at 1032 ("In this case, Guttman filed his federal suit while his petition for certiorari to the New Mexico Supreme Court was pending. His state suit was not final. As such, the Rooker–Feldman doctrine does not bar his federal suit and the district court does have subject matter jurisdiction to hear the case"). The court would agree that, to the extent the declaratory relief claim seeks a declaration that it has no obligation to issue an additional 1.6 million shares to Ironridge, it attacks a judgment that is not yet final, and is not barred by the *Rooker–Feldman* doctrine for the reasons enunciated in *Exxon Mobil*. *Exxon Mobil*, 544 U.S. at 292, 125 S.Ct. 1517. As noted, however, the claim appears to rest on demands for additional shares beyond the 1.6 million, and to request that Scrips need not comply with the terms of the stipulated judgment at any point in the future. This is a broader attack on the validity of that judgment, which is final, and falls within the scope of the *Rooker–Feldman* bar.

For the reasons stated, the court denies Ironridge's motion to dismiss Scrips' Rule 10b–5, breach of contract, and breach of the covenant/tortious bad faith claims un-

der the *Rooker–Feldman* doctrine. It also denies Ironridge's request to dismiss Scrips' declaratory relief claim to the extent it seeks a declaration that it is not obligated to issue 1.6 million additional shares of stock to Ironridge as directed by the state court's enforcement order currently on appeal. It grants Ironridge's motion to the extent Scrips seeks a declaration that it be excused altogether from performing under the terms of the stipulated judgment.

## D. Whether the Court Should Abstain from Deciding Scrips' Claims under *Younger v. Harris*

### 1. Legal Standard Governing Abstention under *Younger*

Under the doctrine first articulated in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), federal courts must abstain from hearing cases that would interfere with pending state court proceedings that implicate important state interests. *Potrero Hills Landfill, Inc. v. County of Solano*, 657 F.3d 876, 881 (9th Cir.2011) (citing *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982)). The doctrine is justified by considerations of comity; "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Younger*, 401 U.S. at 44, 91 S.Ct. 746.

"Absent 'extraordinary circumstances,' abstention in favor of state judicial proceedings is required if the state

64. *Id.*

proceedings (1) are ongoing, (2) implicate important state interests, and (3) provide the plaintiff an adequate opportunity to litigate federal claims." *Hirsh v. Justices of Supreme Court of California,* 67 F.3d 708, 712 (9th Cir.1995) (citing *Middlesex County Ethics Committee,* 457 U.S. at 437, 102 S.Ct. 2515). Even then, abstention is appropriate only where the federal action enjoins the state court proceedings or has the practical effect of doing so. *AmerisourceBergen Corp. v. Roden,* 495 F.3d 1143, 1149 (9th Cir.2007); *Gilbertson v. Albright,* 381 F.3d 965, 978 (9th Cir.2004) (en banc) ("*If* a state-initiated proceeding is ongoing, and *if* it implicates important state interests . . ., and *if* the federal litigant is not barred from litigating federal constitutional issues in that proceeding, *then* a federal court action that would enjoin the proceeding, or have the practical effect of doing so, would interfere in a way that *Younger* disapproves" (emphasis original)).

▮▮▮▮ While the Supreme Court has never directly addressed the subject, the Ninth Circuit has held "that *Younger* principles apply to actions at law as well as for injunctive or declaratory relief." *Gilbertson,* 381 F.3d at 968 (reasoning that "a determination that the federal plaintiff's constitutional rights have been violated would have the same practical effect as a declaration or injunction on pending state proceedings"). If, in a case in which the plaintiff seeks damages, the court determines that the *Younger* abstention is appropriate, it should stay the matter until the state court proceedings are concluded, rather than dismissing the action. *Id.* at 981–82.

### 2. Application of *Younger* to the Facts of this Case

▮▮▮▮ Ironridge argues that the court should dismiss Scrips' complaint under *Younger* because this action is "a blatant attempt to interfere with the enforcement of the stipulated judgment."[65] It contends that enforcement proceedings are ongoing because they are currently on appeal in state court.[66] Scrips concedes that the enforcement order is on appeal to the California Court of Appeal.[67] "For *Younger* purposes, the State's trial-and-appeals process is treated as a unitary system, and for a federal court to disrupt its integrity by intervening in mid-process would demonstrate a lack of respect for the State as sovereign." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans,* 491 U.S. 350, 369, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989). Thus, " '[a] necessary concomitant of *Younger* is that a party [wishing to contest in federal court the judgment of a state judicial tribunal] must exhaust his state appellate remedies before seeking relief in the District Court.' " *Id.* (quoting *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 608, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975)). For that reason, the first threshold requirement to *Younger* abstention—an ongoing state court proceeding—is satisfied.

Ironridge argues that the second threshold requirement is met as well, because the state court enforcement proceeding implicates an important state interest, i.e., the state's "interest in enforcing the orders and judgments of its courts." See *Sprint Communications, Inc. v. Jacobs,* —— U.S. ——, 134 S.Ct. 584, 588, 187 L.Ed.2d 505 (2013) (citing *Pennzoil Co. v. Texaco Inc.,* 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987)). Scrips counters that this action does not involve the type of matters that

---

**65.** Motion at 11.

**66.** *Id.* at 12–13.

**67.** Opposition at 8.

have traditionally been regarded as vital state interests.[68] It asserts that, because the stipulated judgment case was the product of an agreement between the parties, there was no substantial "process" in the state court, and hence any *de minimis* state interest is outweighed by the federal interest in enforcing securities laws.[69] The Supreme Court has "repeatedly recognized that the States have important interests in administering certain aspects of their judicial system." *Pennzoil Co.*, 481 U.S. at 12–13, 107 S.Ct. 1519; *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 759 (9th Cir.2014) (*Younger* applies when state court proceedings "involve a state's interest in enforcing the orders and judgments of its courts"); *Root v. Schenk*, 953 F.Supp. 1115, 1121 (C.D.Cal. 1997) (same).

As the Ninth Circuit has cautioned, however, "[t]aken out of context, these statements suggest that California's interest in enforcing the judgment *in this particular case* is of sufficient importance to meet *Younger's* second threshold element." See *AmerisourceBergen*, 495 F.3d at 1150 (emphasis original). That court has "made it

clear that '[t]he importance of the [state's] interest is measured by considering its significance broadly, rather than by focusing on the state's interest in the resolution of an individual case.'" *Id.* (quoting *Baffert v. Cal. Horse Racing Bd.*, 332 F.3d 613, 618 (9th Cir.2003)); see also *Champion Int'l Corp. v. Brown*, 731 F.2d 1406, 1408 (9th Cir.1984) ("[A] challenge[ ] [to] only one ... order, not the whole procedure" is "not a substantial enough interference with [a state's] administrative and judicial processes to justify abstention"). "Accordingly, binding [Ninth Circuit] precedent prevents the court from finding that California's interest in enforcing this one particular judgment—as opposed to a state's wholesale interest in preserving its procedure for posting an appeal bond [see *Pennzoil Co.*, 481 U.S. at 12–14, 107 S.Ct. 1519], or its interest in retaining a particular contempt of court scheme [see *Juidice v. Vail*, 430 U.S. 327, 330, 335, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) ],—qualifies as sufficiently 'important' to satisfy *Younger's* second threshold element." *Id.* For this reason, the court cannot dismiss Scrips' complaint based on *Younger* abstention.[70]

---

68. *Id.* at 9.

69. *Id.*

70. The court notes also that, notwithstanding the three threshold prerequisites to *Younger* abstention, Ironridge would also have to persuade the court that permitting this action to proceed "would enjoin the [state] proceeding, or have the practical effect of doing so." See *Gilbertson*, 381 F.3d at 978 (*"If* a state-initiated proceeding is ongoing, and *if* it implicates important state interests ..., and *if* the federal litigant is not barred from litigating federal constitutional issues in that proceeding, *then* a federal court action that would enjoin the proceeding, or have the practical effect of doing so, would interfere in a way that *Younger* disapproves" (emphasis original)); see also *Samples v. Washington State Executive Ethics Bd.*, No. 12–CV–5418–BHS, 2012 WL 5285202, *3 (W.D.Wash. Oct. 25, 2012) ("The final *Younger* requirement is that

the federal suit would 'interfere' with the ongoing state proceeding (i.e., enjoin or have the practical effect of enjoining the proceeding)," quoting *San Jose Silicon Valley Chamber of Commerce Political Action Comm. v. City of San Jose*, 546 F.3d 1087, 1095 (9th Cir.2008)). The mere fact that Scrips' Rule 10b–5, breach of contract, and breach of implied covenant/tortious bad faith claims seek a determination that Ironridge breached the stipulation does not automatically compel the conclusion that litigating the claims would have the practical effect of "enjoining" the state court proceedings. The same is true of Scrips' declaratory relief claim to the extent that claim seeks a declaration that Scrips need not issue shares beyond the initial issuance and the 1.6 million shares that are the subject of the state court's enforcement order. To the extent, the state court would be free to proceed "in its own way and in its own time, without reference to the proceedings in th[is] [ ] court."

### E. Whether the Court Should Stay Scrips' Claims under *Colorado River Water Conservation District v. United States*

#### 1. The *Colorado River* Doctrine

Ironridge next asserts that the action should be dismissed or stayed under *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), which applies "in situations involving the contemporaneous exercise of concurrent jurisdictions [.]" "In *Colorado River*, the Supreme Court was concerned with the problem posed by the contemporaneous exercise of concurrent jurisdiction by state and federal courts." *Smith v. Central Ariz. Water Conservation Dist.*, 418 F.3d 1028, 1032–33 (9th Cir.2005) (citing *Gilbertson*, 381 F.3d at 982 n. 17). "In such cases, the Court recognized there may be circumstances in which traditional abstention principles do not apply, yet considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litiga-

tion, nonetheless justify a decision to stay or dismiss federal proceedings pending resolution of concurrent state court proceedings." *Smith*, 418 F.3d at 1033 (internal quotation marks and citations omitted). "Such circumstances are, however, exceedingly rare. As [the Ninth Circuit] previously observed, the *Colorado River* doctrine is a narrow exception to the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Id.*

▮▮▮▮▮ "To decide whether a particular case presents the exceptional circumstances that warrant a *Colorado River* stay or dismissal, the district court must carefully consider 'both the obligation to exercise jurisdiction and the combination of factors counseling against that exercise.'" *R.R. Street & Co. Inc. v. Transport Ins. Co.*, 656 F.3d 966, 978 (9th Cir. 2011) (quoting *Colorado River*, 424 U.S. at 818, 96 S.Ct. 1236). The Ninth Circuit has identified eight factors useful in assessing the propriety of a stay or dismissal under *Colorado River*. These are: "(1) which

See *AmerisourceBergen*, 495 F.3d at 1152. Consequently, permitting Scrips' claims for breach of contract, breach of implied covenant/tortious bad faith, and declaratory relief (to the extent it seeks a declaration that Scrips need not issue shares beyond the initial issuance and the 1.6 million shares that were the subject of the enforcement order) would not have the practical effect of enjoining the state court proceedings. See *Thein v. Feather River Cmty. Coll.*, No. 06–CV 1777–FCD–GGH, 2008 WL 2783172, *5 (E.D.Cal. July 16, 2008) ("Defendant does not contend that the impact these actions will have on the state proceedings would be anything beyond a potential claim or issue preclusive effect. As such, these actions will not enjoin or have the practical effect of enjoining the state proceedings. Each tribunal is still free to proceed 'in its own way.' Should a judgment be rendered in these actions or in the state proceedings, the other tribunal[ ] would then consider the claim or issue preclusive effects as [it] would any other question of fact or law.

Thus, 'concurrent consideration, not abstention, is the solution.' Accordingly, defendant's motions to stay these actions based on the *Younger* abstention doctrine are DENIED").

Scrips' request for a declaration that it need not issue the additional 1.6 million shares that are the subject of the enforcement order, by contrast, would be the type of federal court involvement of which *Younger* disapproves. See *Alsager v. Bd. of Osteopathic Med. & Surgery*, 573 Fed.Appx. 619, 621 (9th Cir.2014) ("Alsager's federal complaint seeks a declaration that the investigatory component of Washington's disciplinary process is unconstitutional and an injunction barring the use of certain information in the disciplinary proceedings. Either form of relief would 'enjoin, declare invalid, or otherwise involve the federal courts' in the proceedings against him"). Because the stipulation does not implicate an important state interest, however, Ironridge's motion to dismiss on *Younger* abstention grounds must be denied.

court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court." [71] *Id.* at 978–79. "The factors relevant to a given case are subjected to a flexible balancing test, in which one factor may be accorded substantially more weight than another depending on the circumstances of the case, and 'with the balance heavily weighted in favor of the exercise of jurisdiction.'" *Holder v. Holder,* 305 F.3d 854, 870–71 (9th Cir. 2002) (quoting *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 16, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)).

As an initial matter, Ironridge seeks a *Colorado River* stay only as to Scrips' breach of contract, breach of implied covenant/tortious bad faith, and declaratory relief claims. It acknowledges that the state court has no concurrent jurisdiction to hear Scrips' Rule 10b–5 claim, and thus does not seek to have the court should stay that claim. See *Intel Corp. v. Advanced Micro Devices, Inc.,* 12 F.3d 908, 913 n. 7 (9th Cir.1993) ("the circuit courts, and the Ninth Circuit in particular, have uniformly held that a district court may not grant a stay in [cases involving claims subject to exclusive federal jurisdiction]"); *Minucci v. Agrama,* 868 F.2d 1113, 1115 (9th Cir. 1989) ("*the Colorado River* doctrine only applies to claims under the concurrent jurisdiction of the federal and state courts");

*Silberkleit v. Kantrowitz,* 713 F.2d 433, 436 (9th Cir.1983) ("the district court has no discretion to stay proceedings as to claims within exclusive federal jurisdiction under the wise judicial administration exception"); *Krieger v. Atheros Communications, Inc.,* 776 F.Supp.2d 1053, 1058 (N.D.Cal.2011) (holding *Colorado River* did not apply to claims under the Securities Exchange Act because such claims fall within the exclusive jurisdiction of federal courts).

The Ninth Circuit has not addressed the propriety of issuing a partial *Colorado River* stay. District courts in the Ninth Circuit have repeatedly found partial stays permissible, however, "where some, but not all, of a federal plaintiff's claims are pending in a parallel state action." *Krieger,* 776 F.Supp.2d at 1060–61 (staying plaintiff's state law class action claims while permitting federal securities law claims to proceed); see also *Taylor v. AlliedBarton Sec. Servs. LP,* No. 13–CV–01613–AWI, 2014 WL 1329415, *5 n. 6 (E.D.Cal. Apr. 1, 2014) (observing that "[c]ourts in the Ninth Circuit have [ ] held that a partial stay of proceedings is authorized under the *Colorado River* doctrine," and staying state law claims while permitting a Fair Labor Standards Act claim to proceed); *Sperber–Porter v. Kell,* No. CV–08–01424–PHX–GMS, 2009 WL 1600689, *5 (D.Ariz. June 8, 2009) ("Finally, Plaintiffs do not disagree that the Court's stay of the declaratory judgment claim was proper. Plaintiffs confine their motion to arguing that the Court should not have stayed the breach of contract claim, and Plaintiffs have never disputed that their declaratory judgment claim regarding the meaning of paragraph fifteen of the settlement agreement is identical to

---

**71.** The first two of these factors are not relevant to this motion; consequently, the court's discussion is limited to the remaining six.

the issue before (and now decided by) the state court. Thus, there is no dispute that at least a partial stay was proper"); *In re Countrywide Fin. Corp. Derivative Litig.*, 542 F.Supp.2d 1160, 1172 (C.D.Cal.2008) (concluding that a partial stay of state law claims raised in both state and federal proceedings are under *Colorado River* was permissible, and permitting a federal securities law claim to go forward); *Daugherty v. Oppenheimer & Co.*, No. CV 06–7725 PJH, 2007 WL 1994187, *6 (N.D.Cal. July 5, 2007) ("In addition, contrary to the argument advanced by plaintiff, the court finds that *Colorado River* applies even where a state court action will not resolve all the claims in the federal action. Neither *Holder* nor *Intel* supports plaintiff's argument that the *Colorado River* doctrine may not be used to dismiss or stay only part of an action. *Holder* and *Intel* simply stand for the proposition that a *Colorado River* motion may not be granted where a defendant seeks to stay claims in the federal court action that are *unrelated* to the state court claims. Here, by contrast, Oppenheimer does not seek to stay or dismiss the nationwide collective action claims that will not be resolved by the *Handler* action").[72] Based on the reasoning of these cases, and the purpose of the *Colorado River* doctrine generally, the court concludes that, consistent with Ironridge's motion, it may stay Scrips' breach of contract, breach of implied covenant/tortious bad faith, and declaratory relief claims under *Colorado River*, while permitting Scrips' Rule 10b–5 claim to proceed.

**2. Whether a Stay Under *Colorado River* Would Be Appropriate**

▮ "The threshold question in deciding whether *Colorado River* abstention is appropriate is whether there are parallel federal and state suits." *Chase Brexton Health Services, Inc. v. Maryland*, 411 F.3d 457, 463 (4th Cir.2005). In the Ninth Circuit, "exact parallelism [between the two suits] ... is not required. It is enough if the two proceedings are 'substantially similar.'" *Nakash v. Marciano*, 882 F.2d 1411, 1416 (9th Cir.1989); see also *County of Marin v. Deloitte Consulting LLP*, No. C 11–00381 SI, 2011 WL 3903222, *1 (N.D.Cal. Sept. 6, 2011) ("The threshold for applying the Colorado River doctrine is whether the two cases are substantially similar. Substantial similarity does not mean that the cases must be identical"). This inquiry examines whether the suits involve the same parties and the same claims. See *Nakash*, 882 F.2d at 1416 ("The present parties are all named in the California suit"); see also *Illinois School Dist. Agency v. Pacific Ins. Co., Ltd.*, 471 F.3d 714, 718 (7th Cir.2006) ("The court also rejected Pacific's argument that the district court should abstain

---

72. District courts in other circuits have also issued partial *Colorado River* stays. See *Calleros v. FSI Int'l, Inc.*, 892 F.Supp.2d 1163, 1171 (D.Minn.2012) ("Some cases, including *Giles* and *In re Countrywide*, have granted *partial* stays in similar circumstances, concluding that Exchange Act claims, which are subject to exclusive federal jurisdiction, cannot be stayed even when abstention [as to] related fiduciary-duty claims is warranted"); *Big O Tires, LLC v. Felix Bros.*, No. 10–CV–00362–PAB–KLM, 2011 WL 6181448, *4 (D.Colo. Dec. 13, 2011) (granting a partial stay because "[p]roceeding here on claims that are not presently before the state court

strikes an appropriate balance between the obligation to exercise jurisdiction and the inefficiency, inconvenience, and potential for piecemeal litigation presented by the adjudication of identical claims"); *Giles v. ICG, Inc.*, 789 F.Supp.2d 706, 714 (S.D.W.Va. 2011) (finding "unpersuasive plaintiffs' argument that a stay was prohibited where a plaintiff asserted both state and federal causes of action," and concluding that the "grant of a partial stay will efficiently sever the issues to be determined by this Court and the Court of Chancery so that no court renders duplicative holdings").

under [*Colorado River*] because the proceedings were not parallel and because they were between different parties involving different contracts"); *Lumen Const., Inc. v. Brant Const. Co., Inc.*, 780 F.2d 691, 695 (7th Cir.1985) (in deciding whether cases are parallel, a court should look "for a substantial likelihood that the state litigation will dispose of all claims presented in the federal case"); *Crawley v. Hamilton County Commissioners*, 744 F.2d 28, 31 (6th Cir.1984) (holding that the state proceeding were not parallel because different defendants were named and the federal complaint included more allegations); *Innovation Ventures, LLC v. Ultimate Lifestyles, LLC*, No. 4:08–CV–232, 2009 WL 1490589, *3 (E.D.Tex. May 27, 2009) ("The Court has weighed the *Colorado River* factors here and finds that abstention is not appropriate at this time. Primarily, this case and the Dallas state court case involve different parties"); *Becker v. Granholm*, 272 F.Supp.2d 643, 645 (E.D.Mich.2003) ("[T]he *Colorado River* abstention doctrine is inapplicable because the requirement of a 'parallel state proceeding' is lacking where, as here, the state and federal lawsuits involve different parties"). The inquiry also asks whether the disputes involve, in a more general sense, the same facts. See *Nakash*, 882 F.2d at 1416 ("All of these disputes concern how the respective parties have conducted themselves since Nakash purchased a portion of Guess").

 In determining whether two suits are substantially similar, if the district court has "a substantial doubt as to whether the state proceedings will resolve the federal action [the doubt] precludes the granting of a [*Colorado River*] stay." *Intel Corp. v. Advanced Micro Devices, Inc.*, 12 F.3d 908, 913 (9th Cir.1993). As the Supreme Court has noted,

"[w]hen a district court decides to dismiss or stay under *Colorado River*, it presumably concludes that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties. If there is any substantial doubt as to this, it would be a serious abuse of discretion to grant the stay or dismissal at all. Thus, the decision to invoke *Colorado River* necessarily contemplates that the federal court will have nothing further to do in resolving any substantive part of the case, whether it stays or dismisses." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 28, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

For this reason, "[a] district court may enter a *Colorado River* stay order only if it has 'full confidence' that the parallel state proceeding will end the litigation." *Intel*, 12 F.3d at 913 (citing *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 277, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988)).

 The state court action and this action involve the same parties; their respective positions as plaintiff and defendant are simply reversed. The state action does not involve the federal securities claim; as noted, however, the court will not stay that claim. As for the claims that are subject of Ironridge's *Colorado River* motion—Scrips' breach of contract, breach of implied covenant/tortious bad faith, and declaratory relief claims—the court concludes that the claims are, if not exactly parallel, certainly substantially similar, as the factual basis for all of the claims is nearly identical. Specifically, Scrips' claims in this action assert that Ironridge breached the stipulation's express and implied terms; these are the same claims it raised as a defense to Ironridge's application for an order enforcing the stipulation

and directing the issuance of an additional 1.6 million shares of Scrips stock. The facts on which the state and federal claims are based are also the same. Scrips' declaratory relief claim seeks both a declaration that it need not issue the 1.6 million shares the state court ordered it to issue, and a declaration that it need not issue any additional shares in the future. While the latter claim was not asserted in the state court action, it is based on the same facts as the breach of contract and breach of implied covenant/tortious bad faith claims. Indeed, the declaratory relief claim seeks a declaration that Scrips need not issue additional shares because Ironridge breached the stipulation in bad faith.

The relief Scrips seeks, moreover, also appears to be the substantially identical in both actions. In state court, Scrips seeks, *inter alia,* to avoid having to issue more shares of stock pursuant to the stipulation. This is what Scrips seeks here as well, in addition to damages for securities fraud and breach of express and implied terms of the parties' agreement. Consequently, it appears the actions are substantially similar, and that the federal action is a "spin-off" of more comprehensive state litigation. See *Nakash,* 882 F.2d at 1416 (noting that courts "should be particularly reluctant to find that ... actions [a]re not parallel when the federal action [was] but a 'spin off' of more comprehensive state litigation"). Because there is substantial

overlap between the factual allegations, legal issues, and relief sought in the state and federal actions, the court concludes that the threshold requirement of parallel federal and state actions is met.

### 3. Examining the *Colorado River* Factors [73]

#### a. The Desire to Avoid Piecemeal Litigation

▉ "Piecemeal litigation occurs when different tribunals consider the same issue, thereby duplicating efforts and possibly reaching different results." *Am. Int'l Underwriters, (Philippines), Inc. v. Continental Ins. Co.,* 843 F.2d 1253, 1258 (9th Cir.1988). "The mere possibility of piecemeal litigation does not constitute an exceptional circumstance." *R.R. Street & Co. Inc.,* 656 F.3d at 980. Rather, "the case must raise a 'special concern about piecemeal litigation,' which can be remedied by staying or dismissing the federal proceeding." *Id.* (quoting *Travelers Indem. Co. v. Madonna,* 914 F.2d 1364, 1369 (9th Cir.1990)).

▉ The parties dispute whether the state and federal actions raise the same issues. Ironridge contends that the issues are essentially identical. The state court ordered Scrips to issue 1.6 million shares of stock to Ironridge, and Scrips now seeks declaratory relief, *inter alia,* that it need not do so; its damages claims, moreover, are based on the fact that it had to

---

**73.** "In proceedings *in rem* or *quasi in rem,* the forum first assuming custody of the property at issue has exclusive jurisdiction to proceed." *40235 Washington Street Corp. v. Lusardi,* 976 F.2d 587, 589 (9th Cir.1992) (citing *Colorado River,* 424 U.S. at 819, 96 S.Ct. 1236, and *Donovan v. City of Dallas,* 377 U.S. 408, 411, 84 S.Ct. 1579, 12 L.Ed.2d 409 (1964)); see *Federal Home Loan Mortgage Corp. v. Ha,* 145 F.3d 1337, 1998 WL 340118, *1 (9th Cir. June 1, 1998) (Unpub.Disp.) ("Although the existence of a case in one forum does not generally defeat jurisdiction in an-

other, there is a firmly-rooted exception to this rule: in cases concerning real property, whichever forum assumes control over the property first has exclusive jurisdiction to proceed"). Neither the state court case nor this action is a proceeding *in rem* or *quasi in rem.* This factor is therefore neutral. Similarly, there is no indication that the federal forum will be any more or less convenient for the parties than state court. Both this court and the Los Angeles Superior Court are located in Los Angeles. Accordingly, this factor too is neutral.

issue more shares than it should have due to Ironridge's allegedly fraudulent conduct. The breach of contract and tortious bad faith claims are based on conduct that Scrips argued in state court precluded the granting of Ironridge's application to enforce the adjustment provision of the stipulated judgment. The court ultimately rejected Scrips' arguments and granted Ironridge's application. As noted, that order is now on appeal; it thus constitutes an ongoing proceeding. Scrips counters that this action raises "principally ... federal securities law issues" and should not be stayed.[74] Ironridge does not seek to stay litigation of the securities fraud claim, and the court agrees that that claim cannot be stayed. See *Intel Corp.,* 12 F.3d at 913 n. 7; *Minucci,* 868 F.2d at 1115; *Silberkleit,* 713 F.2d at 436; *Krieger,* 776 F.Supp.2d at 1058. It court has determined, however, that a partial stay of the remaining claims can be entered if appropriate.

Adjudication of the federal case will unquestionably involve addressing many of the same, if not all of the same, issues that are being litigated in state court. These include whether (1) Ironridge's trading activity was a breach of the express or implied terms of the stipulation; and (2) whether Scrips was required to issue additional shares as contemplated by the contractual formula set forth in the stipulation.[75] If these issues were to be litigated here as well as state court, there would be substantial duplication of effort. As the Supreme Court has repeatedly noted, " 'wise judicial administration' " counsels against such a waste of resources. *Moses H. Cone Memorial Hospital,* 460 U.S. at 15, 103 S.Ct. 927 (quoting *Colorado River,*

424 U.S. at 818, 96 S.Ct. 1236). Nonetheless, nothing about the case "raise[s] a 'special concern about piecemeal litigation,' which can be remedied by staying or dismissing the federal proceeding." *R.R. Street & Co. Inc.,* 656 F.3d at 980 (quoting *Travelers Indem.,* 914 F.2d at 1369). "[T]he Ninth Circuit has explained that the concern for avoidance of piecemeal litigation weighs in favor of a stay only when "there is evidence of a strong federal policy that all claims should be tried in the state courts," " *Melt Franchising, LLC v. PMI Enterprises, Inc.,* No. CV 08–4148 PSG (MANx), 2008 WL 4811097, *3 (C.D.Cal. Oct. 27, 2008) (citing *United States v. Morros,* 268 F.3d 695, 706–07 (9th Cir.2001)). No such clear federal policy exists in this case. Therefore, this factor does not support entry of a stay.

### b. The Order in Which the Forums Obtained Jurisdiction

 This factor addresses the sequence in which the courts obtained jurisdiction over the action, and examines the relative progress of each case. See *R.R. Street & Co., Inc.,* 656 F.3d at 980; see also *Moses H. Cone Mem. Hospital,* 460 U.S. at 21, 103 S.Ct. 927 (holding that courts should apply this factor "in a pragmatic, flexible manner with a view to the realities of the case at hand"). "[P]riority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." *Moses H. Cone Mem. Hospital,* 460 U.S. at 21, 103 S.Ct. 927.

 The state court action was filed on October 11, 2013;[76] the court entered an

---

74. Opposition at 12.

75. The court has already dismissed Scrips' declaratory relief claim under *Rooker–Feldman* insofar as it assails the validity and en-

forcement of the underlying state court order entering the stipulation.

76. State Court Complaint at 1.

order on the parties' stipulation on November 8, 2013. Thereafter, on May 6, 2014, the state court entered an order enforcing the stipulated judgment and directing the issuance of 1.6 million shares of Scrips stock. Scrips appealed the order, and its opening brief was due October 15, 2014, prior to the hearing on this motion. Scrips commenced this federal action May 22, 2014; the court has yet to set a case management scheduled or take any other action. Ironridge's motion is the first activity in the case. The state action has therefore progressed substantially further than the federal action, which weighs in favor of entering a stay. See *R.R. Street & Co., Inc.*, 656 F.3d at 980 (concluding that state court's "significant progress" toward resolution of dispute weighed against exercise of jurisdiction).

**c. Whether Federal or State Law Provides the Rule of Decision on the Merits and Whether the State Court Proceedings Can Adequately Protect the Rights of the Federal Litigants**

■ The court addresses these factors in tandem, as they raise overlapping issues. While "the presence of federal-law issues must always be a major consideration weighing against surrender" of jurisdiction, Ironridge does not seek a stay of Scrips' Rule 10b–5 claim. *Moses H. Cone Mem. Hospital*, 460 U.S. at 25, 103 S.Ct. 927. Scrips' breach of contract, breach of the covenant/tortious bad faith, and declaratory relief claims arise under state law. State law will therefore provide the rule of decision with respect to these claims. The existence of state law issues, by itself, does not outweigh the federal court's obligation to provide a prompt resolution of all the claims before it, state and federal. See *Travelers Indem.*, 914 F.2d at 1370 (stating that the presence of state law issues weighs against jurisdiction only in " 'in

some rare circumstances,' " and that the fact that the case raised only "routine issues of state law—misrepresentation, breach of fiduciary duty, and breach of contract—which the district court [was] fully capable of deciding" did not reflect such "rare circumstances"). Since Scrips' state law claims involve routine issues of state law that this court is fully capable of deciding, there are no "rare circumstances" here that would justify a stay. See *Travelers Indem.*, 914 F.2d at 1370; *Melt Franchising, LLC*, 2008 WL 4811097, at *3 (finding this factor weighed against dismissal or stay because state law claims were routine). Accordingly, this factor weighs against staying the federal action.

■ The next factor asks whether the state court proceeding can adequately protect the rights of the federal litigants. "A district court may not stay or dismiss the federal proceeding if the state proceeding cannot adequately protect the rights of the federal litigants. For example, if there is a possibility that the parties will not be able to raise their claims in the state proceeding, a stay or dismissal is inappropriate." *R.R. Street & Co. Inc.*, 656 F.3d at 981; see also *Holder*, 305 F.3d at 871 (stating that the state forum was inadequate because the "state court proceedings [would] not reach the key issues that must be adjudicated to get relief"); *Travelers Indem.*, 914 F.2d at 1370 ("This factor involves the state court's adequacy to protect federal rights, not the federal court's adequacy to protect state rights," and " 'is more important when it weighs in favor of federal jurisdiction,' " quoting *Bethlehem Contracting Co. v. Lehrer/McGovern, Inc.*, 800 F.2d 325, 328 (2d Cir.1986)); compare *American Intern. Underwriters*, 843 F.2d at 1259 ("[T]he state court·procedure in this case that AIU labels inadequate is nothing more than a set of evidentiary rules AIU does not like. As Continental

correctly points out, [the Supreme Court and Ninth Circuit have not] suggested that adverse evidentiary rulings could ever rise to the level of rendering a state court proceeding inadequate").

■ Here, Scrips does not contend it is inadequately protected in state court. The Court of Appeal and Superior Court can unquestionably adequately protect its rights. However, the Ninth Circuit "has not applied this factor against the exercise of federal jurisdiction, only in favor of it." *Travelers Indem.*, 914 F.2d at 1370. It has suggested, moreover, that "the possibility that the state court proceeding might adequately protect the interests of the parties is not enough to justify the district court's deference to the state action. This factor, like choice of law, is more important when it weighs in favor of federal jurisdiction." *Id.* (quoting *Bethlehem Contracting Co.*, 800 F.2d at 328). Thus, because these claims involve state law issues, this factor is of little or no weight here. See *id.* ("Thus, this factor is of little or no weight here; 'unhelpful' is an apt characterization.").

### d. The Desire to Avoid Forum Shopping

■ "To avoid forum shopping, courts may consider 'the vexatious or reactive nature of either the federal or the state litigation.'" *R.R. Street & Co. Inc.*, 656 F.3d at 981 (quoting *Moses H. Cone Mem. Hospital,* 460 U.S. at 17 n. 20, 103 S.Ct. 927); see also *American Intern. Underwriters,* 843 F.2d at 1259 ("After two-and-a-half years, AIU is abandoning its state court case solely because it believes that the Federal Rules of Evidence are more favorable to it than the state evidentiary rules. This epitomizes forum shopping").

■ Ironridge portrays this action as an egregious example of forum shopping by Scrips. Scrips does not respond direct-ly, but asserts that it filed in federal court because the court has exclusive jurisdiction over its securities fraud claim. As respects Scrips' breach of contract, breach of implied covenant/tortious bad faith, and declaratory relief claims, the reactive nature of the suit suggests forum shopping, as Scrips filed this action only days after it appealed the state court's enforcement order that implicitly rejected claims that Ironridge breached the stipulation's express and implied terms and that required it to issue 1.6 million additional shares of stock. It thus appears that Scrips may have concluded it does not have a good chance of prevailing on appeal and opted to pursue its claims in a new venue. See *Conte v. Aargon Agency, Inc.,* No. 2:12–cv–02811–MCE–DAD, 2013 WL 1907722, *5 (E.D.Cal. May 7, 2013) ("Plaintiff's filing of her class action complaint in this Court appears to be an attempt to forum shop and avoid the state court's adverse ruling. The 'reactive nature' of the federal litigation is quite clear because Plaintiff filed her federal action shortly after the state court's ruling denying Plaintiff leave to amend her complaint to add a Section 632 claim.... Thus, it is obvious to the Court that Plaintiff, like [the] plaintiff in *Nakash,* has become dissatisfied with the state court's decision on the merits of her claim and now seeks a new forum to litigate that claim. The Ninth Circuit and this Court alike have no interest in encouraging Plaintiff's forum shopping practice. Thus, the seventh factor—the desire to avoid forum shopping—weighs strongly in favor of dismissal of the instant federal action"); see also *Hume v. Bankhead,* 108 F.3d 1385, 1997 WL 121202, *2 (9th Cir. Mar. 17, 1997) (Unpub.Disp.) ("Finally, the nature and timing of Hume's federal action indicates that Hume impermissibly sought to avoid the adverse state court ruling by forum shopping. Here, the state court

dismissed Hume's amended complaint without leave to amend on March 29, 1996. Only five days later, Hume refashioned his state complaint into a nearly identical section 1983 action, and filed the federal complaint on April 3, 1996. Accordingly, we conclude that the last relevant *Nakash* factor also supports the district court's decision to stay its proceedings").

The fact Scrips pled a Rule 10b–5 claim in addition to state law claims tempers this conclusion somewhat. See *R.R. Street & Co.*, 656 F.3d at 982 ("Prior to filing the Federal Action, Street/National Union had not previously asserted their claims against Transport, and we are cautious about labeling as 'forum shopping' a plaintiff's desire to bring previously unasserted claims in federal court"). Nonetheless, particularly given the timing of the suit, the court concludes that this factor weighs slightly in favor of staying the case.

### e. Whether the State Court Proceedings Will Resolve All Issues Before the Federal Court

 The last, and most important, factor is whether state court proceedings will conclusively resolve all issues pending in federal court. "[T]he existence of a substantial doubt as to whether the state proceedings will resolve the federal action precludes the granting of a [*Colorado River*] stay." *Intel Corp.*, 12 F.3d at 913. "When a district court decides to dismiss or stay under *Colorado River*, it presumably concludes that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties. If there is any substantial doubt as to this, it would be a serious abuse of discretion to grant the stay or dismissal at all...." *Id.* (quoting *Moses H. Cone Memorial Hospital*, 460 U.S. at 28, 103 S.Ct. 927).

 The only critical difference the court perceives between the state and federal actions is the presence of a securities fraud claim that cannot be adjudicated in state court. Scrips' declaratory relief claim seeks a declaration that it need not issue any additional shares (including the 1.6 million shares the state court has ordered it to issue) to Ironridge; as respects the 1.6 million shares Scrips is required to issue pursuant to the enforcement order, there is absolute identity between the actions. To the extent the declaratory relief claim seeks a declaration that Scrips need not issue other shares in the future, its claim in this court is not identical to its position in the state court action. Despite this fact, a determination as to whether Ironridge's trading conduct was a breach of the express or implied terms of the stipulation will resolve whether Scrips need issue additional shares as required by the formula set forth in the stipulation, since its only argument that it should not be compelled to do so is that Ironridge breached the express and/or implied contract terms. While Scrips has not asserted counterclaims for breach of contract or breach of the implied covenant in state court, it has raised and litigated all of the issues those claims present—i.e., that Ironridge acted unlawfully under the stipulated judgment. As Ironridge puts it, Scrips "has simply repackaged [its] defenses to the enforcement order as claims for fraud, breach of contract, and bad faith."[77] In entering the enforcement order that required the issuance of an additional 1.6 million shares, the state court rejected Scrips' argument that Ironridge breached the stipulation in bad faith. Its findings are now being litigated in the state appellate court. The question, therefore, is whether resolution of Scrips' defenses to

---

**77.** Reply at 21.

the enforcement order in state court will have preclusive effect on Scrips' claims for breach of contract, breach of the implied covenant, and declaratory relief in this action.

 " 'Res judicata' describes the preclusive effect of a final judgment on the merits. Res judicata, or claim preclusion, prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them. Collateral estoppel, or issue preclusion, 'precludes relitigation of issues argued and decided in prior proceedings.' " *Mycogen Corp. v. Monsanto Co.*, 28 Cal.4th 888, 896, 123 Cal.Rptr.2d 432, 51 P.3d 297 (2002) (quoting *Lucido v. Superior Court*, 51 Cal.3d 335, 341, 272 Cal.Rptr. 767, 795 P.2d 1223 (1990)). "In the case of issue preclusion, it must appear that the first matter presented some issue that is necessary to the later claim or defense, and that the issue was actually litigated and necessarily decided." See *In re Fireside Bank Cases*, 187 Cal.App.4th 1120, 1127, 115 Cal. Rptr.3d 80 (2010). Issue preclusion bars later claims based on issues that were raised or could have been raised as affirmative defenses in the former action. See *Sutphin v. Speik*, 15 Cal.2d 195, 202 (1940) ("[Issue preclusion] also operates to demand of a defendant that all his defenses to the cause of action urged by the plaintiff be asserted under the penalty of forever losing the right to thereafter so urge them," quoting *Price v. Sixth District*, 201 Cal. 502, 511, 258 P. 387 (1927)); *Anolik v. Deatsch*, No. C060331, 2010 WL 3002793,

*4 (Cal.App. Aug. 2, 2010) (Unpub.Disp.) (affirming the trial court's determination that a retaliatory eviction claim was precluded because in a prior unlawful detainer action, plaintiff, as the defendant, asserted retaliatory eviction as a defense); *Snyder v. Ashkenazy Enterprises, Inc.*, 277 Cal. Rptr. 788, 802 (Cal.App. Jan. 30, 1991) (Unpub.Disp.) (finding that a claim related to compliance with a rent stabilization ordinance had been actually litigated and decided in prior actions because it had been raised as affirmative defense, and holding alternatively that even if the claim "had not been raised as an affirmative defense [in the prior suit], the issue would now be barred since it could have been raised in the prior actions").[78]

Here, Scrips asserted defenses to the enforcement order that included breach of contract and breach of the implied covenant. It argued that Ironridge had violated the "express terms of the settlement" by, *inter alia,* "short selling, dumping, and/or through other tactics ... artificially depress[ing] the value of Scrips stock, which, in turn, has resulted in larger share issuances to Ironridge under the adjustment feature of the stipulation." [79] It also asserted that the same conduct breached the covenant of good faith and fair dealing implied in the contract.[80] Scrips' claims for breach of contract and breach of the implied covenant, premised as they are on Ironridge's allegedly unlawful post-stipulation dumping and manipulation of Scrips' share price, were thus raised as defenses in the state court action.

---

78. *Anolik* and *Snyder* are unpublished decisions of the California Court of Appeal. "Although the court is not bound by unpublished decisions of intermediate state courts, unpublished opinions that are supported by reasoned analysis may be treated as persuasive authority." *Scottsdale Ins. Co. v. OU Interests, Inc.*, No. C 05–313 VRW, 2005 WL 2893865, *3 (N.D.Cal. Nov. 2, 2005) (citing

*Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n. 8 (9th Cir.2003) ("[W]e may consider unpublished state decisions, even though such opinions have no precedential value")).

79. Order to Compel Opp. at 4.

80. *Id.* at 5.

At the hearing, Scrips disputed whether the state court's entry of an enforcement order in the face of its defenses constituted "actual litigation" of the defenses for purposes of issue preclusion. Under California law, "an issue is actually litigated when it is properly raised by the pleadings or otherwise, is submitted for determination and is actually determined." *Gage v. Tristan*, 108 F.3d 337, 1997 WL 76178, *3 (9th Cir. Feb. 21, 1997) (Unpub.Disp.) (citing *People v. Sims*, 32 Cal.3d 468, 484, 186 Cal.Rptr. 77, 651 P.2d 321 (1982)); *Hernandez v. City of Pomona*, 46 Cal.4th 501, 511, 94 Cal.Rptr.3d 1, 207 P.3d 506 (2009) ("For purposes of collateral estoppel, an issue was actually litigated in a prior proceeding if it was properly raised, submitted for determination, and determined in that proceeding"). Scrips properly asserted as defenses to Ironridge's application for an enforcement order that Ironridge had breached the parties' agreement as well as the covenant of good faith and fair dealing implied therein. It did so in a brief it filed in opposition to Ironridge's *ex parte* application seeking enforcement of the stipulation. Claims are "actually litigated even though there was no hearing," provided they are raised in pleadings or other motion papers and are necessary to the court's decision. See *id.* at *3 ("Here, the state superior court found that Gage's allegations were not sufficiently compelling to justify the issuance of an order to show cause. It therefore did not issue an order to show cause and did not hold an evidentiary hearing. But the issues were raised in Gage's habeas petition. The district court, in adopting the magistrate judge's recommendation, properly held that the claims were actually litigated even though there was no hearing because Gage had presented his arguments in the petition and the state court had considered those arguments and determined that Gage failed to establish a prima facie case"). It was necessary for the state court actually to decide the issues raised in Scrips' opposition because, had it determined that Ironridge breached the express or implied terms of the stipulation, it would not have been entitled to receive additional shares thereunder. See *Plotnik v. Meihaus*, 208 Cal.App.4th 1590, 1602, 146 Cal.Rptr.3d 585 (2012) ("in contract law a material breach excuses further performance by the innocent party"); *Brown v. Grimes*, 192 Cal.App.4th 265, 277, 120 Cal.Rptr.3d 893 (2011) ("Before any party to an obligation can require another party to perform any act under it, he must fulfill all conditions precedent thereto imposed upon himself; and must be able and offer to fulfill all conditions concurrent so imposed upon him on the like fulfillment by the other party," citing CAL. CIV.CODE § 1439). The state appellate court will similarly have to address and resolve these issues.[81] Accordingly, once the state court litigation concludes, its determination as to whether the enforcement order was properly entered, and as to the legality of Ironridge's conduct under the stipulation, will have preclusive effect with respect to Scrips' breach of contract and breach of the implied covenant claims. See *Anolik*, 2010 WL 3002793 at *4 (holding that a claim was barred where underlying issues had previously been litigated as defense);

**81.** Scrips argued at the hearing that its appeal concerns procedural irregularities, and does not attack the trial court's decision respecting its defenses to enforcement of the stipulation. The parties did not ask the court to take judicial notice of Scrips' opening brief. Assuming this is correct, however, the defenses were unquestionably decided by the trial court. If the trial court's ruling is affirmed by the appellate court—even if on different grounds—the issue will have necessarily been fully and finally decided in the state court proceedings.

*Snyder*, 277 Cal.Rptr. at 802 (same). Thus, although Scrips' declaratory relief claim appears to reach beyond the 1.6 million shares the state court ordered it to issue, and to embrace any further shares Ironridge seeks under the stipulated formula, the state court's conclusion as to whether Ironridge breached the stipulation will apply not only to the 1.6 million shares, but to the issuance of additional shares as well. This is because the conduct at issue and the alleged injury, i.e., Ironridge's purported breach of the stipulation and Scrips' issuance of additional shares, are the same.

*Colorado River* and its progeny permit abstention "if [the court] has full confidence that the parallel state proceeding will 'be an adequate vehicle for the complete and prompt resolution of the issues between the parties.'" *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 277, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988) (quoting *Moses H. Cone Memorial Hospital*, 460 U.S. at 28, 103 S.Ct. 927). The court concludes that this standard is met. The appellate court will either affirm the enforcement order, barring relitigation here of Scrips' claims that Ironridge breached the express or implied contract terms, or reverse, holding that Scrips has no obligation to issue the shares because of Ironridge's breach. The state court's determination will also resolve Scrips' declaratory relief claim, which is premised on allegations that Ironridge breached the stipulation. The state court will expressly decide whether Scrips must issue the 1.6 million shares that are the subject of the enforcement order, and the basis for this decision will control whether Scrips must perform according to the formula in the stipulation in the future as well. Thus, the issues underlying the federal claims will be fully and finally resolved by the state court. For this reason, there is no substantial doubt that the state court action

will resolve all of the issues raised by Scrips' breach of contract, breach of the covenant/tortious bad faith, and declaratory relief claims.

### f. Balancing the *Colorado River* Factors

In sum, Scrips' state law claims in this action are nearly identical to the issues it raised in opposition to Ironridge's application for an order enforcing the stipulation and compelling the issuance of 1.6 million additional shares of Scrips stock. That application was filed, was decided on the merits in the trial court, and was appealed before this action was commenced. Final decision of the state court action will resolve whether Ironridge breached the express terms of the stipulation and/or the covenant of good faith and fair dealing implied therein. That determination will resolve whether Scrips must issue the additional 1.6 million shares that are the subject of the enforcement order, and/or other shares in the future pursuant to the formula in the stipulation. Exercising jurisdiction over Scrips' breach of contract, breach of implied covenant/tortious bad faith and declaratory relief claims would therefore result in needlessly duplicative effort and present the potential for conflicting state and federal judgments on the same issues. While there is no strong federal policy against piecemeal litigation in this instance, there is some indication that Scrips filed this action to forum shop following an adverse ruling by the state trial court. On balance, therefore, the court concludes that it is appropriate to stay Scrips' claims for breach of contract, breach of the covenant/tortious bad faith, and declaratory relief under the *Colorado River* doctrine.

### F. Whether the Court Should Dismiss Scrips' Rule 10b–5 Claim

Ironridge argues that Scrips' Rule 10b–5 claim fails for several reasons. First, it

contends that Scrips has failed to plead securities fraud with particularity. Second, it asserts that Scrips cannot plead reliance as a matter of law. Third, it argues that Scrips has failed adequately to plead facts giving rise to a strong inference of scienter. Finally, it contends that Scrips has failed to plead loss causation.

### 1. Legal Standard Governing the Pleading of Securities Fraud Claims

 "A securities fraud complaint under § 10(b) and Rule 10b–5 must satisfy the dual pleading requisites of Federal Rule of Civil Procedure 9(b) and the [Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4]." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir.2012). Rule 9(b) of the Federal Rules of Civil Procedure provides that the "circumstances constituting fraud or mistake shall be stated with particularity." FED. R. CIV. PROC. 9(b). "Generally, a plaintiff must plead 'with particularity' the time and place of the fraud, the statements made and by whom made, an explanation of why or how such statements were false or misleading when made, and the role of each defendant in the alleged fraud." See *Cirulli v. Hyundai Motor Co.*, No. SACV 08–0854 AG (MLGx), 2009 WL 5788762, *4 (C.D. Cal. June 12, 2009) (citing *In re GlenFed, Inc. Securities Litigation*, 42 F.3d 1541, 1547–49 (9th Cir. 1994) (en banc); *Lancaster Community Hospital v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir.1991)); see also *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir.2007) ("Generally, a plaintiff must plead the "time, place, and specific content" of allegedly fraudulent conduct to satisfy Rule 9(b)").

 Thus, a securities fraud claim cannot survive a motion to dismiss merely by alleging that certain statements were false.

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008) ("A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet th[e Rule 9(b)] standard"); see also *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 390 (9th Cir.2010) ("Plaintiffs must 'demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression,'" quoting *In re Convergent Technologies Securities Litigation*, 948 F.2d 507, 512 (9th Cir. 1991)). Rather, the complaint must allege "why the disputed statement was untrue or misleading *when made*." *In re GlenFed Inc. Securities Litigation*, 42 F.3d 1541, 1549 (9th Cir.1994) (en banc) (emphasis added). It must also provide specifics concerning who made the statement and when it was made.

In 1995, Congress passed the PSLRA, which amended the Securities Exchange Act of 1934. The PSLRA modified Rule 9(b)'s particularity requirement, "providing that a securities fraud complaint [must] identify: (1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1); see *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 996 (9th Cir.1999). The statute requires that, in pleading that each allegedly misleading statement or omission was made with scienter, the plaintiff "state with particularity ... facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). If the complaint does not contain such allegations, it must be dismissed. 15 U.S.C. § 78u–

4(b)(3)(A).[82]

■ In enacting the PSLRA, "Congress 'impose[d] heightened pleading requirements in actions brought pursuant to § 10(b) and Rule 10b–5.'" *Tellabs,* 551 U.S. at 320, 127 S.Ct. 2499 (citing *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71, 81, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006)). The PSLRA's requirements "prevent[ ] a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating why the defendant's alleged statements or omissions are deceitful." *Metzler,* 540 F.3d at 1061 (citing *Falkowski v. Imation Corp.,* 309 F.3d 1123, 1133 (9th Cir.2002)).

### 2. Legal Standard Governing Liability Under Section 10(b) and Rule 10b–5

Rule 10b–5, promulgated by the Securities and Exchange Commission pursuant to section 10(b) of the 1934 Act, makes it unlawful for any person to use "manipulative or deceptive device[s]" in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). Specifically, one cannot "(a) . . . employ any device, scheme, or artifice to defraud; (b) . . . make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) . . . engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

■ "Regardless of whether a § 10(b) plaintiff alleges a misrepresentation, omission, or manipulation, he must plead and prove the following elements: (1) . . . use or employ[ment of] a[ ] manipulative or deceptive device or contrivance; (2) scienter, i.e.[,] [a] wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to. . . . as transaction causation; (5) economic loss; and (6) loss causation, i.e. [,] a causal connection between the manipulative or deceptive device or contrivance and the loss." *Desai v. Deutsche Bank Secs. Ltd.,* 573 F.3d 931, 939 (9th Cir.2009) (internal quotation marks omitted); see also *Simpson v. AOL Time Warner Inc.,* 452 F.3d 1040, 1047 (9th Cir.2006), vacated on other grounds by *Avis Budget Group, Inc. v. Cal. State Teachers' Ret. Sys.,* 552 U.S. 1162, 128 S.Ct. 1119, 169 L.Ed.2d 945 (2008).

■ In addition to pleading falsity adequately, the pleading must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "Scienter" refers to "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Ninth Circuit has articulated a "two-part inquiry for scienter: first, [the court must] deter-

---

**82.** The PSLRA creates a "safe harbor" for "forward-looking" statements that are immaterial, are limited by "meaningful cautionary statements," or are made without actual knowledge of their falsity. 15 U.S.C. §§ 77z–2(c), 78u–5(c). Such statements include, but are not limited to, statements of future economic performance and management plans and objectives. 15 U.S.C. §§ 77z–2(I), 78u–

5(I). This "safe harbor" has much the same effect as the "bespeaks caution" doctrine, which provides that forward-looking representations that contain adequate cautionary language or risk disclosure protect a defendant from securities liability. See, e.g., *Plevy v. Haggerty,* 38 F.Supp.2d 816, 830 (C.D.Cal. 1998).

mine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegation is sufficient, ... the court [must] conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *New Mexico State Investment Council v. Ernst & Young,* 641 F.3d 1089, 1095 (9th Cir.2011) (citing *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 991–92 (9th Cir.2009)).

■■■ The Ninth Circuit has emphasized that, to allege scienter, "plaintiffs 'must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct.'" *Middlesex Retirement System v. Quest Software Inc.,* 527 F.Supp.2d 1164, 1179 (C.D.Cal.2007) (quoting *Silicon Graphics,* 183 F.3d at 974); see also *Silicon Graphics,* 183 F.3d at 977 ("recklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct"). The requisite state of mind must be a " 'departure from the standards of ordinary care [that] presents a danger of misleading buyers that is either known to the defendant or so obvious that the actor must have been aware of it.'" *Zucco Partners,* 552 F.3d at 991 (quoting *Silicon Graphics,* 183 F.3d at 984). If plaintiff relies on allegations of recklessness, the pleading standard requires that it "state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Silicon Graphics,* 183 F.3d at 979. Allegations of mere negligence are insufficient. *Glazer Capital Management, LP v. Magistri,* 549 F.3d 736, 748 (9th Cir.2008) ("At most, it creates the inference that he *should have known* of the violations. This is not sufficient to meet the stringent scienter pleading require-

ments of the PSLRA"); *Police Retirement Systems of St. Louis v. Intuitive Surgical, Inc.,* No. 10–CV–03451–LHK, 2011 WL 3501733, *7 (N.D.Cal. Aug. 10, 2011) ("[T]he Ninth Circuit defines 'recklessness' as a highly unreasonable omission [or misrepresentation], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must ·have been aware of it").

■■ "To qualify as 'strong' within the intendment of ... the PSLRA ... an inference of scienter must be more than merely plausible or reasonable—it must be cogent and *at least as compelling as any opposing inference of nonfraudulent intent." Tellabs,* 551 U.S. at 314, 127 S.Ct. 2499 (emphasis added). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss.... The inquiry ... is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23, 127 S.Ct. 2499 (emphasis original).

■■ In determining whether a plaintiff has alleged facts giving rise to a strong inference of scienter, the court must draw all reasonable inferences from the allegations presented, including inferences unfavorable to plaintiffs. *Gompper v. VISX, Inc.,* 298 F.3d 893, 897 (9th Cir. 2002). "However, the 'inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences." ... [T]he inference of scienter must be more than merely "reasonable" or "permissible[,]" [however]—it

must be cogent and compelling .... in light of other explanations.'" *Middlesex Retirement System,* 527 F.Supp.2d at 1179 (quoting *Tellabs,* 551 U.S. at 314, 127 S.Ct. 2499).

The Ninth Circuit often treats the falsity and scienter analyses as "a single inquiry, because falsity and scienter are generally inferred from the same set of facts." *In re New Century,* 588 F.Supp.2d 1206, 1227 (C.D.Cal.2008) (citing *In re Read–Rite Corp.,* 335 F.3d 843, 846 (9th Cir.2003), abrogated by *Tellabs* on other grounds, as recognized in *South Ferry LP, No. 2 v. Killinger,* 542 F.3d 776 (9th Cir.2008), and *Ronconi v. Larkin,* 253 F.3d 423, 429 (9th Cir.2001)). The court therefore analyzes Scrips' falsity and scienter allegations in tandem below.

### 3. Whether Scrips Has Pled False or Misleading Statements or Manipulative Conduct with Particularity

 Ironridge argues that Scrips fails to identify any false or misleading statements, or to explain why its actions or statements were purportedly false.[83] It maintains that to the extent Scrips contends there was a discrepancy between alleged oral representations by Ironridge and the representations contained in the stipulated judgment, the terms of the stipulated judgment control, since it expressly provided that Ironridge did "not make or ha[d] not made any representations or warranties other than those specifically set forth herein."[84] Ironridge also asserts that Scrips' CEO, CFO, and its outside counsel read, approved, and executed the stipulation. Hence it contends Scrips cannot now complain it was misled. See *Davis v. HSBC Bank Nevada, N.A.,* 691 F.3d 1152, 1163 (9th Cir.2012) ("California courts have held that where, as here, the parties to an agreement deal at arm's length, it is not reasonable to fail to read a contract before signing it" (citations omitted)); *Operating Engineers Pension Trust v. Gilliam,* 737 F.2d 1501, 1504 (9th Cir. 1984) ("We recognize that a party who signs a written agreement generally is bound by its terms, even though he neither reads it nor considers the legal consequences of signing it," citing *Frame v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 20 Cal.App.3d 668, 671, 97 Cal.Rptr. 811(1971), and RESTATEMENT (SECOND) OF CONTRACTS § 23, comments b, e (1981)); see also *Rodriguez v. Shen Zhen New World I LLC,* No. CV 13–02959–RSWL, 2014 WL 908464, *3 (C.D.Cal. Mar. 6, 2014) (same). Finally, Ironridge maintains that Scrips' CEO expressly affirmed that its "board of directors ha[d] considered the proposed transaction and ha[d] resolved that its terms and conditions [were] fair to, and in the best interests of, [Scrips] and its stockholders."[85]

Scrips does not respond to these arguments; it contends instead that its allegations concern market manipulation.[86] "'Manipulation,' the Supreme Court has recognized, 'is virtually a term of art when used in connection with securities markets. The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.'" *Desai,* 573 F.3d at 938–39. Ironridge asserts that to state a market manipulation claim, Scrips must plead that Ironridge engaged in trading practices "intended to mislead investors by artificially affecting market activity." *Santa Fe In-*

---

**83.** Motion at 17.

**84.** Stipulation, ¶ 11.

**85.** Schneiderman Decl., ¶ 8.

**86.** Opposition at 12–14.

*dus., Inc. v. Green,* 430 U.S. 462, 476, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

 Scrips pleads only that Ironridge sold more shares than it purportedly agreed to sell within a given period, which violated an alleged oral agreement not to sell an amount of Scrips stock that exceeded 10 % of the total shares traded on any given day. Deception arises when an investor is erroneously led to believe that the price of the security in question is driven by the " 'natural interplay of supply and demand, not rigged by manipulators.' " *Desai,* 573 F.3d at 944 (quoting *Gurary v. Winehouse,* 190 F.3d 37, 45 (2d Cir.1999)). "[N]ondisclosure is usually essential to the success of a manipulative scheme." *Santa Fe Indus., Inc.,* 430 U.S. at 477, 97 S.Ct. 1292; see also *In re UBS Auction Rate Sec. Litig.,* No. 08–CV–2967(LMM), 2010 WL 2541166, *17 (S.D.N.Y. June 10, 2010) (same). Thus, "[t]he market is not mis[led] when a transaction's terms are fully disclosed." See *In re Bank of Am. Corp.,* No. 09–MD–02014 JSW, 2011 WL 740902, *7 (N.D.Cal. Feb. 24, 2011) (citing *In re Merrill Lynch Auction Rate Sec. Litig.,* 704 F.Supp.2d 378, 390 (S.D.N.Y.2010) (internal quotation marks omitted)).

Here, the terms of the parties' agreement were disclosed in filings in the state court action—specifically, the stipulated judgment. As a result, Scrips—whose board approved the agreement and stipulation, and whose CEO stated that the terms of the stipulated agreement were fair—cannot contend that the transaction's terms were not fully disclosed. The parties' agreement, and hence the stipulated judgment, placed no cap on the number of Scrips shares Ironridge could sell in any given period; it provided, in fact, that the shares were "unrestricted" and "freely tradable," and that Ironridge could "sell any of its shares of [Scrips] common stock issued pursuant to the [settlement] *at any time.*" [87] The stipulated settlement even warned that the issuance "[might] have a dilutive effect [on Scrips stock], which [could] be substantial." [88] These disclosures preclude Scrips' claim that Ironridge engaged in market manipulation.

*S.E.C. v. Ficeto,* 839 F.Supp.2d 1101 (C.D.Cal.2011), and *S.E.C. v. Masri,* 523 F.Supp.2d 361 (S.D.N.Y.2007), cited by Scrips, do not compel a different result. In *Ficeto,* the SEC alleged that defendants had engaged in "matched orders," "marking the close" transactions, and wash trades—techniques that are "intended to mislead investors by artificially affecting market activity." 839 F.Supp.2d at 1104. The SEC asserted that defendants carried out matched orders and wash trades by directing traders to execute buy and sell orders for stocks at specific times and in specific quantities; they used multiple brokers to buy and sell the same shares, and then reported the trades to FINRA, which publicly disseminated the trading price and volume to the market. This, in turn, gave the false impression of high trading volume when in fact the shares remained in the same hands. As a result of their actions, defendants allegedly made millions of dollars from stock sales, sales credits, commissions, and fees. *Id.* By contrast, here, Scrips alleges only that it was misled by Ironridge's statements and assurances regarding the amount of stock it would sell in a given period—statements that were not contained in the stipulated judgment or known to the market trading in its stock. Scrips does not complain that investors in its stock were misled as to the effect of Ironridge's trading activity. See

---

87. Stipulation, ¶¶ 6, 11.

88. *Id.,* ¶ 11.

*id.* (" 'Matched' orders are orders for the purchase/sale of a security that are entered with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons for the sale/purchase of such security. 'Marking the close' transactions involve making extensive and successive purchases toward the end of the day to artificially increase the closing price of a security" (citations and quotation marks omitted)). For this reason, *Ficeto* actually supports dismissal of Scrips' Rule 10b–5 claim for failure to allege actionable market manipulation.

*Masri* is no more helpful. First, it is an out-of-circuit district court case that is not binding on the court. Second, Scrips' allegations are quite different than those the SEC made in *Masri*. There, the SEC pled facts showing that defendants had engaged in "marking the close" transactions, i.e., "the practice of repeatedly executing the last transaction of the day in a security in order to affect its closing price." *Masri*, 523 F.Supp.2d at 369. After surveying the law, the court concluded "that if an investor conducts an open-market transaction with the intent of artificially affecting the price of the security, and not for any legitimate economic reason, it can constitute market manipulation." *Id.* at 372. The court therefore held that "[a]llegations of other deceptive conduct or features of the transaction are only required to the extent that they render plausible allegations of manipulative intent." *Id.* It noted that "the SEC alleged that (1) defendants conducted activity within several minutes of the close of trade; (2) the transactions constituted a large majority of the purchases that day; (3) [an individual defendant] had outstanding put options expiring that day that he did not wish to be assigned; and (4) by purchasing 200,000 shares, he was able to avoid ... assign-

ment of these options." *Id.* It found these allegations sufficiently indicative of manipulative intent to state a claim for market manipulation. Scrips does not allege similar facts indicative of manipulative intent here. It merely alleges that Ironridge sold more shares of its stock than it represented it would sell before the parties entered into the stipulation. Absent additional factual allegations, the court cannot conclude that Scrips has adequately alleged that Ironridge engaged in market manipulation. This is particularly true in light of the fact that the stipulated judgment disclosed the fact that Ironridge could sell any of its Scrips stock at any time. *Masri*, therefore, is inapposite. Because Scrips does not allege with particularity conduct constituting market manipulation, as that term is defined for purposes of securities fraud claims, its Rule 10b–5 claim must be dismissed as inadequately pled.

### 4. Whether Scrips Has Adequately Pled Reliance

 Ironridge also contends that Scrip fails adequately to allege reliance. "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action. It ensures that, for liability to arise, the 'requisite causal connection between a defendant's misrepresentation and a plaintiff's injury' exists as a predicate for liability." *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta*, 552 U.S. 148, 159, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 243, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)); *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1159 (9th Cir.1996) ("Justifiable reliance 'is a limitation on a rule 10b–5 action which insures that there is a causal connection between the misrepresentation and the plaintiff's harm,' " quoting *Atari Corp. v. Ernst & Whinney*,

981 F.2d 1025, 1030 (9th Cir.1992) (internal quotation marks omitted)).

 Ironridge maintains that Scrips cannot plead reliance because it admitted in the stipulation on which the state court entered judgment that it was "advised as to the terms and legal effects" of the stipulation, and that Ironridge did not "make or has not made any representations or warranties other than those specifically set forth [in the stipulation]."[89] Scrips does not respond to this argument.[90]

The court agrees that Scrips cannot plead reliance based on the facts alleged. The stipulation states that it contains all relevant representations and warranties; none of its provisions restricts Ironridge from selling the shares Scrips issued to it. For that reason, Scrips cannot plead reliance on Ironridge's allegedly fraudulent statements. See *Bank of the West v. Valley Nat'l Bank of Arizona*, 41 F.3d 471, 476 (9th Cir.1994) (concluding that plaintiff

had not shown reasonable reliance where plaintiff represented in an agreement that it had "independently and without reliance upon any representations of [the lead bank] made … relied upon [its] own credit analysis and judgment" because such language "implie[d] that, to the extent that it did rely on [the lead bank's conflicting representations], [the participating bank's] reliance was not justifiable," and holding that *"the contract could and did control whether such reliance would be justifiable' for purposes of a fraud claim"* (emphasis added));[91] *In re Citigroup Auction Rate Sec. Litig.*, 700 F.Supp.2d 294, 306–07 (S.D.N.Y.2009) ("Furthermore, the documents proffered by Defendants, and of which the Court takes judicial notice, negate any inference that reliance by the class on such a view of the ARS pricing mechanism was reasonable. The 2006 SEC Order, Plaintiff's trade confirmations and language from the Citigroup Smith

---

**89.** Stipulation, ¶¶ 11, 16.

**90.** Reliance can be presumed under the fraud on the market theory where the alleged misrepresentations were disseminated in an impersonal, well developed securities market. See *Merrill Lynch*, 704 F.Supp.2d at 397 ("When a plaintiff alleges that 'materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed' "); see also *Peil v. Speiser*, 806 F.2d 1154, 1163 (3d Cir.1986) ("[T]he fraud on the market theory pertains to rule 10b–5(b) claims"). Here, the alleged misrepresentations/manipulation were part of an arm's length transaction, and Scrips does not allege that the market incorporated the alleged misrepresentations, or that the market for its stock was efficient. The stipulation, which stated that Scrips' stock price fluctuated routinely, would also tend to undercut any such allegation. Consequently, any claim of fraud on the market fails. *In re Citigroup Auction Rate Sec. Litig.*, 700 F.Supp.2d 294, 306 (S.D.N.Y.2009) ("However, where a plaintiff does not plead that the market in which he

purchased his shares was efficient, he cannot rely on the 'fraud-on-the-market presumption' of reliance, and must instead specifically allege reliance"). "Reliance may also be presumed when a plaintiff alleges a material omission." *Merrill Lynch*, 704 F.Supp.2d at 397. Here, however, Scrips alleges, at most, misstatements or manipulation—not omissions. Thus, it cannot take advantage of a presumption of reliance in this case.

**91.** *Bank of the West* involved common law fraud, but the Ninth Circuit has applied its reasoning to Rule 10b–5 claims. See *Paracor Fin., Inc.*, 96 F.3d at 1160 ("In *Bank of the West* [ ], in the analogous situation of a common-law fraud cause of action, a lead bank and a participating bank in a loan to a corporation signed a participation agreement. In the agreement, the participating bank represented that it 'independently and without reliance upon any representations of [the lead bank] made and relied upon [its] own credit analysis and judgment.' This language, we held, 'implies that, to the extent that it did rely on [the lead bank], [the participating bank' s] reliance was not justifiable' ").

Barney website incorporated by reference therein, and the official statements issued in connection with ARS specifically enumerated in the Complaint, all disclosed that Defendants could engage in the very conduct of which Plaintiff complains, the advantages that Defendants would have if they did engage in such conduct, the ability of such conduct to affect clearing rates and the possibility that the auctions would fail if Defendants did not intervene in them"); *Briskin v. Ernst & Ernst*, 398 F.Supp. 997, 1009 (C.D.Cal.1975) ("Furthermore, plaintiffs have not denied that after an extended, arm's-length negotiation period, an agreement was reached with Beck which contained neither references to McDevitt's representations nor references to the type of warranties that Sloane unilaterally extended to Beck. This irrefuted fact alone should have alerted plaintiffs to the inherent risks of the transaction as well as the proper credence to be accorded to McDevitt's representations"); see also *Paracor Fin., Inc.*, 96 F.3d at 1159 (investors could not demonstrate reasonable reliance where the purchase agreement on which they purportedly relied stated that they had been given "access to the information [they had] requested from the Company," and that they "made [their] own investment decision with respect to the purchase of the Debentures").

■ The same is true with respect to Scrips' contention that Ironridge engaged in market manipulation. To plead reliance adequately for purposes of a market manipulation claim, plaintiff must allege that it relied on "an assumption of an efficient market free of manipulation." See *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir.2007) ("Market manipulation requires a plaintiff to allege (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4)

scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange."); see also *In re Bank of America Corp.*, No. 09–md–02014 JSW, 2011 WL 740902, *7 (N.D.Cal. Feb. 24, 2011) ("Deception arises when an investor is erroneously lead to believe that the prices for the security in question are driven by the 'natural interplay of supply and demand, not rigged by manipulators'" (citations and quotation marks omitted)). Scrips does not allege that it was damaged because it assumed and relied on an efficient market free of manipulation; it contends it was defrauded by Ironridge and suffered damages as a result of Ironridge's breach of the stipulation and tortious bad faith. For that reason, the court concludes that Scrips does not adequately plead reliance under either a misrepresentation or manipulation theory. Its Rule 10b–5 claim must be dismissed for this reason as well.

### 5. Whether Scrips Pleads Particularized Facts Giving Rise to a Strong Inference of Scienter

■ Ironridge next contends that Scrips' scienter allegations are entirely conclusory. Specifically, it asserts that Scrips does not plead any facts giving rise to a strong inference of fraudulent intent, and that it cannot do so given the content of the stipulated judgment. In response, Scrips does not cite any allegations of scienter, or particular facts giving rise to a strong inference of scienter, as required by PSLRA. See *Tellabs*, 551 U.S. at 314, 127 S.Ct. 2499 ("A complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged"); *Oklahoma Firefighters Pension & Ret. Sys. v. IXIA*, No. CV 13–08440 MMM–SHX, 50 F.Supp.3d 1328, 1352,

2014 WL 4978568, *16 (C.D.Cal. Oct. 6, 2014) ("To qualify as 'strong' within the intendment of … the PSLRA … an inference of scienter must be more than merely plausible or reasonable—it must be cogent and *at least as compelling as any opposing inference of nonfraudulent intent.*" (citation omitted)).

The complaint is replete with allegations of a "scheme to defraud and manipulate," [92] but the allegations are conclusory and fail to raise the claim above the speculative level. Certainly, they do not give rise to a cogent and compelling inference of scienter. See *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 ("Factual allegations must be enough to raise a right to relief above the speculative level"). There are no facts that support an inference of intent to deceive with respect to Ironridge's alleged statement that it would not sell more than a specific percentage of shares on a single day. Simply alleging that Ironridge said its sales of Scrips' shares would never represent "more than ten percent of the volume of sales on any given day," [93] and that sales were made "with the intent and purpose of increasing the number of shares received," [94] does not suffice to plead a compelling inference of intent to deceive; this is especially true when viewed in light of the disclosures in the stipulation. See *Kaplan v. Charlier,* 426 Fed.Appx. 547, 549 (9th Cir.2011) (Unpub.Disp.) ("While the complaint makes a general allegation that GPI's management knew about the problems, it does not plead any facts to back up this conclusory statement"). As noted, the stipulation provided that shares could be "immediately resold … without restriction," and warned that issuance might "have a dilutive effect, which [could] be substantial." [95] These disclosures are inconsistent with an intent to deceive; in fact, they give rise an alternative, more compelling inference—i.e., that Scrips entered into the agreement knowing full well that Ironridge could sell the shares it issued in any manner Ironridge wished. *City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.,* 963 F.Supp.2d 1092, 1142 (E.D.Wash.2013) ("Robust disclosure of risks and problems further 'negates an inference that the company acted with intent to defraud' "); *In re Dot Hill Systems Corp. Sec. Litig.,* 594 F.Supp.2d 1150, 1160 (S.D.Cal.2008) ("Disclosing the precise risks at issue negates an inference of scienter" (internal quotation marks omitted)); *Alfus v. Pyramid Tech. Corp.,* 745 F.Supp. 1511, 1520 (N.D.Cal.1990) (same). The sales themselves, moreover, cannot be evidence of scienter. Under the plain terms of the agreement, Ironridge was permitted to sell the shares however it pleased; it was not illegal to sell freely transferrable shares in a publicly traded company.

The few facts Scrips pleads regarding scienter, even in combination, do not support a strong inference of scienter. Given the disclosures in the stipulation, the more compelling inherence is that Ironridge did not intend to deceive, and that Scrips knew—or should have known—the nature of the transaction into which it had entered. Holistic review therefore does not demonstrate that it has sufficiently pled scienter. See *In re Verifone Holdings, Inc. Sec. Litig.,* No. CV 07–06140 MHP, 2009 WL 1458211, *10 (N.D.Cal. May 26, 2009) ("There are many allegations in this case, but they fare no better when read in combination than when read independently").

---

**92.** See, e.g., Complaint, ¶¶ 11–27

**93.** Complaint, ¶ 15.

**94.** *Id.,* ¶ 20.

**95.** Stipulation, ¶¶ 6, 11.

In pleading scienter, "[t]he requisite recklessness must be an 'extreme departure from the standards of ordinary care.'" *Middlesex Retirement System*, 527 F.Supp.2d at 1179 (quoting *Silicon Graphics*, 183 F.3d at 984). In light of the disclosures made in the stipulation, the court must conclude that Scrips has failed to plead particularized facts giving rise to a strong inference of scienter. For this reason as well, the court must dismiss Scrips' Rule 10b–5 claim.[96]

## III. CONCLUSION

For the reasons stated, the court denies Ironridge's motion to dismiss Scrips' claims for breach of contract and breach of the implied covenant/tortious bad faith under the *Rooker–Feldman* doctrine. It grants Ironridge's motion to dismiss Scrips' claim for declaratory relief under *Rooker–Feldman* to the extent Scrips seeks a declaration that it is excused from performing generally under the stipulation. It denies the motion as to the balance of the declaratory relief claim. The court denies Ironridge's motion to dismiss based on *Younger* abstention in its entirety. The court grants Ironridge's motion to stay Scrips' breach of contract, breach of implied covenant/tortious bad faith, and declaratory relief claims under *Colorado River*, and grants Ironridge's motion to dismiss Scrips' Rule 10b–5 claim.

As this is the first time the court has had an opportunity to pass on the adequacy of Scrips' Rul 10b–5 claim, and Scrips may be able to amend the claim to allege a plausible claim for relief, the court grants Scrips leave to amend that claim. See *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051 (9th Cir.2008) ("Dismissal without leave to amend is proper if it is clear that the complaint could not be saved by amendment"); *California ex rel. California Department of Toxic Substances Control v. Neville Chemical Co.*, 358 F.3d 661, 673 (9th Cir.2004) ("[D]enial of leave to amend is appropriate if the amendment

---

**96.** Ironridge also argues that Scrips has failed adequately to plead loss causation. As explained in *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), loss causation is the "causal connection between the [defendant's] material misrepresentation and the [plaintiff's] loss." A complaint fails to allege loss causation if it does not "provide[ ] [a defendant] with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation[.]" *Metzler*, 540 F.3d at 1062 (quoting *Dura Pharm.*, 544 U.S. at 347, 125 S.Ct. 1627); see also *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 186 (4th Cir.2007) (holding that plaintiffs must plead [loss causation] "with sufficient specificity to enable the court to evaluate whether the necessary causal link exists"). "Stated in the affirmative, the complaint must allege that the defendant's 'share price fell significantly after the truth became known [or the manipulation took place].'" *Id.* Of course, a plaintiff need not *prove* loss causation to avoid dismissal. It must, however, properly allege it. See *id.*

Ironridge contends that Scrips' only allegation concerning loss causation is that "[a]s a direct and proximate result of the wrongful conduct of [Ironridge], [Scrips] suffered damages." (Complaint, ¶ 40.) Scrips, however, also alleges that Ironridge's scheme "successfully reduced the market price of [Scrips stock], which had been in the range of 15 cents ($.15) on day of delivery of stock, to the range of ten cents ($.10) and below in April 2014." (*Id.*, ¶ 23.) It also alleges that there "was no economic basis for this reduction" and that it was "purely generated" by Ironridge's sales. (*Id.*) Had Scrips adequately alleged any of the other elements of a Rule 10b5 claim, the court could not say that this allegation fails to "provide[ ] [Ironridge] with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation." *Metzler*, 540 F.3d at 1062. For that reason, the court declines to dismiss Scrips' Rule 10b–5 claim on this basis. Because the claim is not adequately pled for other reasons, however, it must nonetheless be dismissed.

would be futile," citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). Any amended complaint must be filed within thirty (30) days of the date of this order.

Scrips may not plead additional claims or add allegations except those intended to cure the defects identified in its Rule 10b–5 claim. Should Scrips' amended complaint exceed the scope of leave to amend granted by this order, the court will strike the offending portions from the pleading under Rule 12(f). See FED.R.CIV.PROC. 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act: (1) on its own; or (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading."); see also *Barker v. Avila*, No. 2:09–cv–00001–GEB–JFM, 2010 WL 3171067, *1–2 (E.D.Cal. Aug. 11, 2010) (striking an amendment to federal law claim where the court had granted leave to amend only state law claims).